SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
J. Gregory Milmoe
Kenneth S. Ziman
J. Eric Ivester

Proposed Counsel for Debtors and
   Debtors-in-Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
|  | : |  |
| In re | : | Chapter 11 |
|  | : |  |
| MF GLOBAL HOLDINGS LTD., <u>et al.</u>, | : | Case No. 11-15059 (MG) |
|  | : |  |
|  | : | (Joint Administration Pending) |
| Debtors. | : |  |
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DECLARATION OF BRADLEY I. ABELOW PURSUANT TO**
**LOCAL BANKRUPTCY RULE 1007-2 AND IN SUPPORT OF CHAPTER 11**
**<u>PETITIONS AND VARIOUS FIRST-DAY APPLICATIONS AND MOTIONS</u>**

  I, Bradley I. Abelow, declare as follows, under penalty of perjury:

  1.  I am the President and Chief Operating Officer of MF Global Holdings

Ltd. ("<u>MF Holdings</u>"), a company incorporated under the laws of the state of Delaware, and

Executive Vice President and Chief Operating Officer of MF Global Finance USA Inc. ("<u>MF</u>

<u>Finance</u>" and, together with MF Holdings, the "<u>Debtors</u>" and, the Debtors, collectively with their

non-Debtor subsidiaries and affiliates, shall be referred to herein as the "<u>Company</u>" or "<u>MF</u>

Global").[1]  Although the Debtors are each independent legal entities, I am authorized to submit this declaration (the "Abelow Declaration") on behalf of both Debtors.  As a result of my tenure with the Debtors, my review of relevant documents, and my discussions with other members of the Debtors' management teams, I am familiar with the Debtors' day-to-day operations, business affairs, and books and records.

2.      I submit this Abelow Declaration pursuant to Rule 1007-2 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules") in support of the Debtors' petitions for relief under the Bankruptcy Code (defined below), filed as of the Petition Date (defined below), and the Debtors' contemporaneously filed requests for relief in the form of motions and applications (the "First-Day Motions").[2]  I have reviewed the Debtors' petitions and the First-Day Motions, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' businesses and the success of the Debtors' reorganization.

3.      Except as otherwise indicated, the facts set forth in this Abelow Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, or my opinion based upon experience, knowledge, and information concerning the operations of the Company.  If called upon to testify, I would testify competently to the facts set forth herein.

4.      This Abelow Declaration is divided into three parts.  Part I of this Abelow Declaration describes the Company's businesses and the circumstances surrounding the

---

[1]  The Debtors consist of: MF Global Holdings Ltd. (EIN: 98-0551260) and MF Global Finance USA Inc. (EIN: 98-0554890).

[2]  Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the relevant First-Day Motion.

commencement of the Debtors' chapter 11 cases. Part II of this Abelow Declaration sets forth the relevant facts in support of the First-Day Motions filed concurrently herewith. Part III sets forth information required by Local Rule 1007-2 to the extent not otherwise provided herein.

## I. BACKGROUND

### A. The Chapter 11 Filing

5. On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Court").

6. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession in these chapter 11 cases. To enable the Debtors to operate efficiently following the chapter 11 filings, the Debtors will request various types of relief in First-Day Motions filed with the Court concurrently herewith.

### B. Background and Current Business Operations

7. MF Global is one of the world's leading brokers in markets for commodities and listed derivatives. The Company provides access to more than 70 exchanges globally and are a leader by volume on many of the world's largest derivative exchanges. The Company is also an active broker-dealer in markets for commodities, fixed income securities, equities, and foreign exchange. MF Global is one of 20 primary dealers authorized to trade U.S. government securities with the Federal Reserve Bank of New York (the "Federal Reserve"). In addition to executing client transactions, MF Global provides research and market commentary to help clients make trading decisions, as well as providing clearing and settlement services. The Company is also active in providing client financing and securities lending services.

8.     MF Global is headquartered in the United States, and has operations globally, including the United Kingdom, Australia, Singapore, India, Canada, Hong Kong, and Japan.  The Company's priority is serving the needs of its diversified global client base, which includes a wide range of institutional asset managers and hedge funds, professional traders, corporations, sovereign entities, and financial institutions.  The Company also offers a range of services for individual traders and introducing brokers.

9.     MF Global has approximately 2,870 employees worldwide, 13 of which are employed by the Debtors in the United States.  MF Global derives revenues from three main sources:  (a) commissions generated from execution and clearing services; (b) principal transactions revenue, generated both from client facilitation and proprietary activities; and (c) net interest income from cash balances in client accounts maintained to meet margin requirements, as well as interest related to MF Global's collateralized financing arrangements and principal transactions activities.  For fiscal 2011, MF Global generated total revenues of approximately $2.2 billion, revenues net of interest and transaction-based expenses of approximately $1.1 billion, and incurred net loss attributable to Debtor MF Holdings, the ultimate parent company, of $81.2 million.

Product Offerings

10.     MF Global provides execution services for five broad categories of products:  commodities, equities, fixed income, foreign exchange, and listed futures and options. Many of the contracts and securities that MF Global trades are listed on exchanges, while others are traded over-the-counter ("OTC").  The Company executes orders for its clients on either an agency or principal basis.  The instruments the Company trades, broken down by product, are described below:

11. <u>Commodities</u>. MF Global provides clients execution services for transactions relating to derivative contracts, including futures, options, forward sale agreements and other types of instruments based on the price of metals and industrial materials. Metal derivatives are traded on exchanges and in the OTC markets. MF Global is one of 12 designated ring-dealing members of the world's larges metals exchange, the London Metal Exchange.

12. MF Global also executes trades in the energy derivatives market, including futures, options, swaps, and forwards on a range of energy products, including crude oil, natural gas, heating oil, gasoline, propane, electricity and other energy commodities. MF Global is an active market participant in both exchange-listed and OTC-traded energy derivatives, and has been consistently ranked as one of the leading providers by volume of clearing and execution services on both the New York Mercantile Exchange and ICE Futures Europe.

13. MF Global also delivers its clients targeted hedging and risk management solutions and helps clients locate trading opportunities in a broad array of agricultural commodities markets. MF Global provides trade execution services for a wide range of OTC and listed agricultural commodities markets, including the grain and oilseed futures and options markets and for soft commodities, such as coffee, cocoa, and sugar, on exchanges in North America, Europe and Asia Pacific.

14. <u>Equities</u>. MF Global provides execution services in both cash equities and equity derivative products around the globe. Equity derivative products include futures, ETFs, options (single stock, index and ETF), contracts for difference (where legally available), and other securities whose underlying value is related to the price of one or more stocks, a basket of stocks, or stock indices. Recently, MF Global expanded its global cash equity, equity derivatives,

portfolio trading, and electronic trading services teams to provide improved service for our clients in a variety of major markets around the world.

15.     Fixed Income.  MF Global provides execution services for a variety of fixed income products.  These include U.S. Treasury and agency securities and bonds issued by European governments and by multinational institutions.  The Company also trades corporate bonds, mortgage-backed and asset-backed securities, emerging market securities, as well as credit default swaps and interest rate swaps.  MF Global has been designated as a primary leader of U.S. treasury securities, enabling it to serve as a counterparty to the Federal Reserve Bank of New York in open-market operations, and participate directly in U.S. Treasury auctions.  MF Global also provides analysis and market intelligence to the Federal Reserve's trading desks and to its clients.

16.     Foreign Exchange.  MF Global delivers access to a range of products and trading opportunities in the foreign exchange markets worldwide.  Many of these foreign exchange transactions are undertaken by MF Global's clients in connection with the purchase or sale of other instruments.  Most foreign exchanges are conducted on an OTC basis.

17.     Futures and Options.  MF Global provides execution services for listed futures and options, including interest rate, government bond, and index futures and options.  MF Global's floor brokers offer clients access to traditional floor execution for futures and options that continue to have price discovery on trading floors.  Where futures and options have moved to electronic trading platforms, MF Global provides extensive electronic connectivity to global markets.

Service Offerings

18.     In addition to executing client transactions, MF Global provides clearing services, which are a critical component of the futures and options business, as well as a range of services designed to assist clients in developing trading ideas and managing their trading portfolios.

19.     Clearing and Financing.  MF Global provides a number of prime services, including clearing and settlement of trades, client financing, securities lending, and a range of administrative services.  The revenue MF Global earns from prime services activities consists of commissions, interest income on client custodial accounts, principal transactions and fees.  In addition to the clearing transactions the Company executes for its own clients, the Company also clears transactions for clients that are using other executing brokers or executing their orders directly on an exchange.  Moreover, MF Global has developed a substantial business in clearing transactions on behalf of other brokers.

20.     Research and Market Commentary.  MF Global offers a broad array of market research, analysis, and commentaries that provide clients with actionable insights they can use to inform their trading strategies and investment decisions.  MF Global's proprietary offerings include research on a wide range of instruments, markets and industries, equity research on many of the world's largest companies and industry sectors, policy-focused research on U.S. legislative and regulatory topics, and analysis of macroeconomic tends and issues driving financial markets.

**C.     Regulation and Exchange Memberships**

21.     MF Global's business activities are extensively regulated by a number of U.S. and foreign regulatory agencies and exchanges.  These regulatory bodies and exchanges are

charged with protecting investors by imposing requirements relating typically to capital adequacy, licensing of personnel, conduct of business, protection of client assets, record-keeping, trade-reporting and other matters.  They have broad powers to monitor compliance and punish non-compliance.  If MF Global fails to comply with applicable regulations, it may be subject to censure, fines, cease-and-desist orders, suspension of its business, removal of personnel, civil and criminal litigation, revocation of operating licenses or other sanctions.

22.     In the United States, MF Global is principally regulated in the futures markets by the Commodity Futures Trading Commission ("CFTC"), the Chicago Mercantile Exchange ("CME"), and the National Futures Association ("NFA") and in the securities markets by the Securities and Exchange Commission ("SEC"), the Financial Industry Regulatory Authority ("FINRA") and the Chicago Board Options Exchange ("CBOE").  Among other things, the CFTC, SEC, FSA and other U.S. and non-U.S. regulators require MF Global to maintain specific minimum levels of regulatory capital in MF Global's operating subsidiaries that conduct its futures and securities business.  Further, as participants in the financial services industry, MF Global's business must comply with the anti-money laundering laws of the jurisdictions in which MF Global does business, including, in the U.S., the USA PATRIOT Act, which requires the Company to know certain information about its clients and to monitor their transactions for suspicious activities, as well as the laws of the various states in which the Company does business or where the accounts with which the Company does business reside.  MF Global's business is also subject to rules promulgated by the U.S. Office of Foreign Assets Control ("OFAC"), which requires that MF Global refrain from doing business, or allow its clients to do business through it, in certain countries or with certain organizations or individuals on a prohibited list maintained by the U.S. government.

**D.    The Company's Corporate and Capital Structure**

23.    MF Holdings is a public company that trades on the New York Stock Exchange under ticker symbol "MF."  The Company's corporate structure is set forth in Exhibit A, attached hereto.  MF Holdings is the parent company of MF Finance, the other Debtor in these chapter 11 cases.  The Company had consolidated assets and liabilities, as of the quarterly period ended September 30, 2011, of approximately $41.0 billion and $39.7 billion, respectively.

24.    Liquidity Facility Agreement.  Pursuant to that certain five-year revolving credit facility dated as of June 15, 2007 (as amended, supplemented or otherwise modified from time to time, the "Liquidity Facility"), among MF Global Ltd., MF Finance (together with MF Holdings,[3] the "Liquidity Facility Borrowers"), JPMorgan Chase Bank, N.A., as Administrative Agent (the "Liquidity Facility Agent"), and the several lenders from time to time parties thereto (such lenders and the Liquidity Facility Agent collectively referred to herein as the "Liquidity Facility Lenders"), the Liquidity Facility Lenders have made available to the Liquidity Facility Borrowers the aggregate principal amount of approximately $1.2 billion, $1.172 billion of which was drawn as of the Petition Date.

25.    On June 29, 2010, the Liquidity Facility was amended (the "Amendment") (i) to permit the Company, in addition to certain of its subsidiaries, to borrow funds under the Liquidity Facility and (ii) to extend the lending commitments of certain of the Liquidity Facility Lenders by two years, from June 15, 2012 (the "Old Maturity Date") to June 15, 2014 (the "Extended Maturity Date").  Aggregate commitments under the amended Liquidity Facility are

---

[3]    On January 4, 2010, MF Global Ltd. changed its jurisdiction of incorporation from Bermuda to the State of Delaware.  MF Global Ltd. has continued its existence as a corporation organized under the laws of the State of Delaware under the name of MF Global Holdings Ltd.

approximately $1.2 billion, of which approximately $689.6 million is available for borrowing until the Extended Maturity Date, and approximately $511.3 million is available for borrowing until the Old Maturity Date. Under the terms of the amended Liquidity Facility, MF Global may borrow under the available loan commitment subject to the Extended Maturity Date to repay the outstanding balance on the Old Maturity Date. As set forth above, MF Global has drawn down on $1.172 billion as of the Petition Date (and the obligations in connection therewith, the "Liquidity Facility Obligations").

26. In all cases, borrowings under the Liquidity Facility are subject to the terms and conditions set forth therein, which contains financial and other customary covenants. The Liquidity Facility includes a covenant requiring the Company to maintain a minimum Consolidated Tangible Net Worth[4] of not less than the sum of (a) 75% of the pro forma Consolidated Tangible Net Worth as of March 31, 2010 after giving effect to the offering by the Company of equity interests on June 2, 2010, including exercise of the underwriters' option to purchase additional shares, and the consummation in whole or in part of the offer to exchange of the Company dated June 1, 2010 plus (b) 50% of the net cash proceeds of any offering by the Company of equity interests consummated after the second amendment effective date plus (c) 25% of cumulative net income for each completed fiscal year of the Company after the second amendment effective date for which consolidated net income is positive. The Liquidity Facility also requires the Company to limit its consolidated capitalization ratio to be no greater

---

[4] As used in the Liquidity Facility, "Consolidated Tangible Net Worth" means, at any date, all amounts that would, in conformity with GAAP, be included in the consolidated GAAP financial statements of the MF Global and its subsidiaries under stockholders' equity at such date less the amount of all intangible items included therein, including, without limitation, goodwill, franchises, licenses, patents, trademarks, trade names, copyrights, service marks, brand names and write-ups of assets.

than 37.5% on or after March 31, 2011 and before March 31, 2012; and 35% on or after March 31, 2012.

27. <u>Secured Facility to MF Global, Inc.</u> On June 29, 2011, the Company's non-Debtor U.S. regulated broker-dealer subsidiary, MF Global Inc. ("<u>MFGI</u>"), entered into a $300 million 364-day secured revolving credit facility (the "<u>MFGI Secured Facility</u>") with a syndicate of lenders (the "<u>MFGI Secured Lenders</u>"), of which MFGI has borrowed approximately $210 million as of the Petition Date. JPMorgan Chase Bank, N.A., who serves as the Liquidity Facility Agent, is also the Administrative Agent under the MFGI Secured Facility (the "<u>MFGI Secured Facility Agent</u>").

28. On all outstanding amounts, the MFGI Secured Facility is secured by eligible collateral owned by MFGI. The two Debtor entities, MF Holdings and MF Finance (together in their capacity as guarantors, the "<u>MFGI Secured Facility Guarantors</u>"), have provided unsecured guarantees under the facility. The borrowings, so long as the MFGI Secured Facility is in effect and there are loans outstanding under that facility, are subject to the terms and conditions set forth in the MFGI Secured Facility. The MFGI Secured Facility includes a covenant requiring MFGI's consolidated tangible net worth at any time not to be less than $227.3 million.

29. <u>Unsecured Convertible Notes</u>. In addition to the indebtedness under the Liquidity Facility Credit Agreement, the Company also owes approximately $287.5 million in unsecured debt under certain 1.875% Convertible Senior Notes due 2016 (the "<u>1.875% Convertible Notes</u>"). The 1.875% Convertible Notes bear interest at a rate of 1.875% per year, payable semi-annually in arrears on February 15 and August 1 of each year, since August 1, 2011. The 1.875% Convertible Notes mature on February 1, 2016. Holders may convert the

1.875% Convertible Notes at their option prior to August 1, 2015 upon the occurrence of certain events relating to the price of its common stock or various corporate events.

30.     The Company also has outstanding approximately $78.6 million in aggregate principal amount of 9.00% Convertible Senior Notes due 2038 (the "9% Convertible Notes").  The 9% Convertible Notes bear interest at a rate of 9.00% per year, payable semi-annually in arrears on June 15 and December 15 of each year.  The 9% Convertible Notes mature on June 20, 2038. Holders may convert the 9% Convertible Notes at their option at any time prior to the maturity date.  Upon conversion, the Company will pay or deliver, as the case may be, cash, common stock or a combination thereof at the Company's election.  The initial conversion rate for the 9% Convertible Notes is 95.6938 shares of Common Stock per $1 principal amount of 9% Convertible Notes, equivalent to an initial conversion price of approximately $10.45 per share of common stock. The conversion rate will be subject to adjustment in certain events.

31.     In July 2011, the Company raised $325 million in aggregate principal amount of 3.375% Convertible Senior Notes due 2018 (the "3.375% Convertible Notes," and, together with the 1.875% Convertible Notes and the 9% Convertible Notes, the "Convertible Notes").  In August 2011, the Company also launched and priced its first senior unsecured debt offering, issuing $325,000,000 in five-year 6.25% senior notes.  The Company used a portion of the net proceeds of these offerings to repurchase a portion of its existing 9% Convertible Notes, repaid a portion of its outstanding permanent indebtedness under its Liquidity Facility and used the remainder for general corporate purposes.

32.     As of June 30, 2011, there were 1,500,000 shares of Series A Preferred Stock in MF Holdings issued and outstanding to J.C. Flowers.  Also as of June 30, 2011, 403,550 shares of Series B Preferred Stock remain outstanding.

## E.     Events Leading To Chapter 11 Filing

33.     As a global financial services firm, MF Global is materially affected by conditions in the global financial markets and worldwide economic conditions.  On September 1, 2011, MF Holdings announced that FINRA informed it that its regulated U.S. operating subsidiary, MFGI, was required to modify its capital treatment of certain repurchase transactions to maturity collateralized with European sovereign debt and thus increase its required net capital pursuant to SEC Rule 15c3-1.  MFGI increased its required net capital to comply with FINRA's requirement.

34.     On October 24, 2011, Moody's Investor Service downgraded its ratings on the Company to one notch above junk status based on its belief that MF Holdings would announce lower than expected earnings.  On October 25, 2011, MF Holdings announced its results for its second fiscal quarter ended September 30, 2011.  The Company revealed that it posted a $191.6 million net loss in the second quarter, compared with a loss of $94.3 million for the same period last year.  The net loss reflected a decrease in revenue primarily due to the contraction of proprietary principal activities.

35.     Dissatisfied with the September announcement by MF Holdings of MFGI's position in European sovereign debt, FINRA demanded that MF Holdings announce that MFGI held a long position of $6.3 billion in a short-duration European sovereign portfolio financed to maturity, including Belgium, Italy, Spain, Portugal and Ireland.  MF Holdings made such announcement on October 25, 2011.  These countries have some of the most troubled

economies that use the euro. Concerns over euro-zone sovereign debt have caused global market fluctuations in the past months and, in particular, in the past week. These concerns ultimately led last week to downgrades by various ratings agencies of MF Global's ratings to "junk" status. This sparked an increase in margin calls against MFGI, threatening overall liquidity.

36.     Concerned about the events of the past week, some of MFGI's principal regulators – the CFTC and the SEC – expressed their grave concerns about MFGI's viability and whether it should continue operations in the ordinary course. While the Company explored a number of strategic alternatives with respect to MFGI, no viable alternative was available in the limited time leading up to the regulators' deadline. As a result, the Debtors filed these chapter 11 cases so that they could preserve their assets and maximize value for the benefit of all stakeholders.

## II. FIRST-DAY MOTIONS

37.     In furtherance of these objectives, the Debtors expect to file a number of First-Day Motions and proposed orders and respectfully request that the Court consider entering the proposed orders granting such First-Day Motions. I have reviewed each of the First-Day Motions and proposed orders (including the exhibits thereto) and the facts set forth therein are true and correct to the best of my knowledge, information and belief. Moreover, I believe that the relief sought in each of the First-Day Motions (a) is vital to enable the Debtors to make the transition to, and operate in, chapter 11 with a minimum interruption or disruption to their businesses or loss of productivity or value and (b) constitutes a critical element in achieving the Debtors' successful reorganization.

## A.     Administrative and Procedural Matters

<u>Joint Administration of Cases</u>

38.     The Debtors seek the joint administration of their chapter 11 cases for procedural purposes only.  I believe that it would be far more practical and expedient for the administration of these chapter 11 cases if the Court were to authorize their joint administration. Many of the motions, hearings, and other matters involved in these chapter 11 cases will affect both of the Debtors.  Hence, joint administration will reduce costs and facilitate the administrative process by avoiding the need for duplicative notices, applications, and orders.

### Schedules and Statements Extension Motion

39.     The Debtors seek to extend the deadline to file schedules and statements of financial affairs to such date that is 91 days from the Petition Date (a seventy-five (75) day extension beyond that already provided by the rules of this Court).  Given the complexity of the Debtors' businesses, as well as the effort required to prepare for and conduct these cases on an emergency basis, I understand that the Debtors will not be in a position to accurately complete their schedules and statements within the deadline allowed for by the Bankruptcy Rules and Local Rules.  To prepare the schedules and statements, the Debtors and their advisors must gather, review, and assemble information from the Debtors' books, records, and documents related to tens of thousands of transactions.  This will require substantial time and effort on the part of the Debtors' employees and advisors.  Thus, I believe that the requested extension is necessary to ensure that the Debtors can focus on their goals in bankruptcy while providing ample time for them to prepare their schedules and statements.

### List of Creditors and Initial Notices

40.     To ease the administrative burden of these cases on the Debtors' estates, the Debtors are seeking authorization to (a) prepare a consolidated list of creditors in electronic format only, identifying their creditors in the format or formats currently maintained in the

ordinary course of business in lieu of any required mailing matrix, (b) file a consolidated list of the 50 largest general unsecured creditors, and (c) mail initial notices. The Debtors are further asking for authority not to file (i) the consolidated list of creditors described in the preceding clause (a) with this Court concurrently with the filing of their bankruptcy petitions, but instead to make such lists available only upon request and (ii) a list of each of each Debtors' equity security holders. I believe that the relief requested will reduce the administrative costs of these chapter 11 cases and is in the best interests of the Debtors' estates.

**B.      Retention of Professionals**

Garden City Group, Inc.

41.      The Debtors have filed an application to retain Garden City Group, Inc. ("GCG") as this Court's claims and noticing agent for the Debtors' chapter 11 cases. In light of the number of anticipated claimants and parties in interest, I submit that appointing GCG, an independent third party, to act as claims and noticing agent will provide the most effective and efficient means, and relieve the Debtors and/or the Clerk's Office of the administrative burden, of noticing, administering claims, and assisting in other administrative tasks, such as soliciting votes on a chapter 11 plan. I believe that GCG is well qualified to provide such services, expertise, consultation, and assistance based on its expertise in the industry and competitive fee structure.

**C.      Business Operations of the Debtors**

Cash Collateral

42.      The Debtors have also sought authority to use Cash Collateral. For the reasons set forth below, the Court's approval of this First-Day Motion is absolutely critical.

43.     The use of Cash Collateral is necessary for the Debtors to maintain sufficient liquidity so that the Debtors may continue to operate their businesses in the ordinary course of business during the chapter 11 cases.  The Debtors' access to the Cash Collateral is necessary in order to ensure that the Debtors have sufficient working capital and liquidity to operate their businesses and thus preserve and maintain the going concern value of the Debtors' estates, which, in turn, is integral to maximizing recoveries for the Debtors' stakeholders. Moreover, in the absence of the use of Cash Collateral, the continued operation of the Debtors' business, even for a limited period of time, would not be possible, and serious and irreparable harm to the Debtors and their estates would occur.

44.     I believe that immediate and ongoing use of Cash Collateral is required to fund the day-to-day activities of the Debtors, including to make payments to employees and vendors in the ordinary course of business whose services and goods are integral to the Debtors' operations.  Unless this Court authorizes use of the Cash Collateral, I do not believe that the Debtors will be unable to pay for services and expenses necessary to preserve and maximize the value of the Debtors' estates.  Moreover, I believe that such relief on an interim basis is necessary to avoid immediate and irreparable harm to the Debtors pending a final hearing.

45.     The Debtors have approximately $26 million in cash which may be Cash Collateral of the Liquidity Facility Agent.   In addition, although the Debtors do not acknowledge the right of the Liquidity Facility Agent to setoff against available cash or securities owned by the Debtors, to the extent such setoff rights exist, the Debtors seek authority to use such Cash Collateral and to grant first priority liens on the Debtors' assets in the event of any decrease in the value of the Cash Collateral.

46.     Specifically, the Cash Collateral Motion seeks authorization to use the Cash Collateral and, with respect any diminution in the Liquidity Facility Agent's interest in the Cash Collateral, to provide adequate protection to the Liquidity Facility Agent under sections 361, 362, 363(c)(2) and 363(e) of the Bankruptcy Code with respect to the use of such Cash Collateral.  I believe that the granting of adequate protection to the Liquidity Facility Agent is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

<u>Cash Management, Business Forms, and Intracompany Transfers</u>

47.     <u>Cash Management</u>.  The Debtors in these chapter 11 cases play a critical role in connection with the Company's case management system.  Specifically, the Debtors serve as intermediaries between the Company's operating non-Debtor affiliates and as a conduit to the Company's creditors.  MF Finance functions as a central depository for the Company's funds.  Correspondingly, aside from the Company's payroll obligations for most employees, MF Holdings funds substantially all of the Company's disbursements after receiving funds for such disbursements from MF Finance.

48.     Prior to the commencement of these cases, in the ordinary course of business, the Company maintained hundreds of outside bank accounts and investment located at financial institutions throughout the United States, through which the Debtors managed cash receipts and disbursements for their entire U.S. corporate enterprise (collectively, the "<u>Bank Accounts</u>").  The Bank Accounts include, among others, those maintained as disbursement accounts and, receipt and lockbox accounts.  As described below, the Debtors hold five such Bank Accounts, which are essential to the Company's cash management system.

49.     The Debtors routinely deposit, withdraw, and otherwise transfer funds to, from, and between their Bank Accounts by various methods including checks, automated

clearing house transactions, electronic funds transfers and direct deposits. The Debtors generate hundreds of wire transfers per month from the Bank Accounts. The Debtors believe that the Bank Accounts are in financially-stable banking institutions with Federal Deposit Insurance Corporation (up to an applicable limit per Debtor per institution) or other appropriate government-guaranteed deposit protection insurance.

50. The Debtors are seeking a waiver of the requirement in the U.S. Trustee Guidelines that the prepetition Bank Accounts be closed and that new postpetition bank accounts be opened. If enforced in these chapter 11 cases, I believe that such requirements would cause enormous disruption to the Debtors' businesses and would impair the Debtors' efforts to reorganize and pursue other alternatives to maximize the value of their estates. Indeed, the Debtors' Bank Accounts are part of a carefully constructed and complex, integrated cash management system that ensures the Debtors' ability to efficiently monitor and control all of their cash receipts and disbursements. I believe that closing the existing Bank Accounts and opening new accounts inevitably would disrupt the Debtors' businesses and result in delays that would impede the Debtors' ability to transition smoothly into chapter 11, and would likewise jeopardize the Debtors' efforts to successfully reorganize in a timely and efficient manner.

51. Business Forms. Prior to the Petition Date, in the ordinary course of business, the Debtors used numerous business forms including, but not limited to, letterhead, purchase orders, invoices, contracts, and checks (collectively, the "Business Forms"). The Debtors have requested that they be authorized to continue to use all Business Forms existing immediately prior to the Petition Date, without reference to the Debtors' status as debtors-in-possession; provided, that the Debtors agree to use their reasonable best efforts to refer to their

status as debtors-in-possession on all checks issued after the Petition Date and on other physical Business Forms after the Debtors' existing stock has been exhausted.

52.     Parties doing business with the Debtors undoubtedly will be aware, as a result of the size and notoriety of the Debtors and these cases, of the Debtors' status as chapter 11 debtors-in-possession. Furthermore, the Debtors conduct a substantial portion of their business with customers and suppliers through electronic data interchange pursuant to which the parties communicate through the simultaneous exchange of electronic data rather than the exchange of physical business forms. As a result, referencing the Debtors' status as debtors-in-possession on Business Forms would not confer any benefit upon those dealing with the Debtors. I believe that a requirement that the Debtors change their Business Forms would be expensive and burdensome to the Debtors' estate and extremely disruptive to the Debtors' business operations. Consequently, I believe that the costs and potential disruption are not justified in this case.

53.     Intercompany Transfers. The Debtors' books and records reflect numerous other intercompany account balances among various Debtors as of the Petition Date. All prepetition intercompany account balances have been frozen, as of the Petition Date, and the treatment of such claims will be determined as part of an overall reorganization plan for the Debtors. To ensure that each individual Debtor will not, at the expense of its creditors, fund the operations of another Debtor entity, the Debtors are requesting that all intercompany claims against a Debtor by another Debtor arising after the Petition Date as a result of intercompany transactions and allocations ("Postpetition Intercompany Claims") be accorded superpriority status. If Postpetition Intercompany Claims are accorded superpriority status, each individual Debtor on whose behalf another Debtor has utilized funds or incurred expenses will continue to

bear ultimate repayment responsibility, thereby protecting the interests of each Debtor's creditors. Nothing herein is a request to validate the nature or amount of any intercompany transaction or claim, whether arising pre or postpetition. The Debtors will continue to maintain records of such transfers, including records of all current intercompany accounts receivable and payable.

54. In addition, in connection with their role under the cash management system facilitating the operations of the non-Debtor affiliates, the Debtors may, in the ordinary course of business, periodically infuse capital into certain of their subsidiaries and affiliates, including non-Debtor non-U.S. affiliates. These infusions of capital generally are accomplished through the making of intercompany loans. The Debtors use repayments of such loans as a tax efficient method of managing cash throughout their worldwide business enterprise. Because the non-Debtor affiliates are part of the same group of affiliated entities as the Debtors, the entirety of intercompany transactions among Debtors and non-Debtor affiliates alike remain within the spectrum of the Debtors' control.

## III. INFORMATION REQUIRED BY LOCAL RULE 1007-2

55. Pursuant to Bankruptcy Rule 1007(d) and Local Rule 1007-2, this declaration provides the following information not already provided for herein:[5]

56. As required under Local Rule 1007-2(a)(4), Exhibit B lists the following information with respect to each of the holders of the Debtors' fifty (50) largest unsecured claims on a consolidated basis, excluding claims of insiders: the creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post office

---

[5]  Local Rule 1007-2(a)(3) requires disclosure of certain information regarding any committee organized prior to the order for relief in a chapter 11 case. As no such committee was formed in these chapter 11 cases, Local Rule 1007-2(a)(3) is not applicable hereto. Local Rule 1007-2(a)(5) requires disclosure of the Debtors' top five secured creditors. As the Debtors do not have any secured creditors, Local Rule 1007(a)(5) is not applicable hereto.

address), telephone number, the name(s) of person(s) familiar with the Debtors' accounts, the amount of the claim, and an indication of whether the claim is contingent, unliquidated, disputed or partially secured. In each case, the claim amounts listed on Exhibit B are estimated and subject to verification. In addition, the Debtors reserve their rights to assert remedies, defenses, counterclaims, and offsets with respect to each claim.

57. As required under Local Rule 1007-2(a)(6), the Debtors submit that the Company had consolidated assets and liabilities, as of the quarterly period ended September 30, 2011, of approximately $41.0 billion and $39.7 billion, respectively.

58. As required under Local Rule 1007-2(a)(7), Exhibit C hereto provides the following information: the number and classes of shares of stock, debentures and other securities of the Debtors that are publicly held and the number of holders thereof; the number and classes of shares of stock, debentures, and other securities of the Debtors that are held by the Debtors' officers and directors and the amounts so held.

59. As required under Local Rule 1007-2(a)(8), Exhibit D hereto provides a general description of the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents or secured creditor, or agent for any such entity.

60. As required under Local Rule 1007-2(a)(9), Exhibit E hereto provides a list of significant premises owned, leased or held under other arrangement from which the Debtors operate their businesses.

61. As required under Local Rule 1007-2(a)(10), Exhibit F hereto provides the location of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held outside the territorial limits of the United States.

62.     As required under Local Rule 1007-2(a)(11), Exhibit G hereto provides a general description of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property, where a judgment against the Debtor or a seizure of its property may be imminent.

63.     As required under Local Rule 1007-2(a)(12), Exhibit H provides the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

64.     As required under Local Rule 1007-2(b)(1)-(2), the estimated amount, on a consolidated basis, to be paid to the Debtors' employees (not including officers, directors, and stockholders) for the 30-day period following the filing of the Debtors' chapter 11 petitions is approximately $90,000 and the estimated amount, on a consolidated basis, to be paid to the Debtors' officers, stockholders, and directors for that same period is $433,000.

65.     As required under Local Rule 1007-2(b)(3), Exhibit J, the Debtors' cash collateral budget, provides a list of estimated cash receipts and disbursements, and net cash gain or loss other than professional fees, on a consolidated basis for the 30-day period following the Petition Date.

66.     Notwithstanding anything to the contrary contained in this declaration or any exhibit attached to this declaration, nothing in this declaration or any exhibit is intended to be, or should be construed as, an admission with respect to (i) the liability for, the amount of, the enforceability of or the validity of any claim, or (ii) the existence, validity, enforceability or perfection of any lien, mortgage, charge, pledge or other grant of security for any claim, or (iii) the proper characterization of any transaction or financing as a sale or financing.  The

Debtors specifically reserve the right to challenge any claim or any transaction or any alleged security for any claim on any and bases.

## IV. CONCLUSION

67. The Debtors' ultimate goal is to reorganize their financial affairs under the terms of a confirmed chapter 11 plan. In the near term, however, to minimize any loss of value of their business during their restructuring, the Debtors' immediate objective is to maintain a business-as-usual atmosphere during the pendency of these chapter 11 cases, with as little interruption or disruption to the Debtors' operations as possible. I believe that if the Court grants the relief requested in each of the First-Day Motions, the prospect for achieving these objectives and completing a successful, rapid reorganization of the Debtors' business will be substantially enhanced.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 31st day of October, 2011.

_____ */s/ Bradley I. Abelow* _____
Bradley I. Abelow