MORRISON & FOERSTER LLP
2000 Pennsylvania Ave., NW
Washington, DC 20006-1888
Tel.:  (202) 887-1500
Fax:  (202) 887-0763
Adam S. Hoffinger
Daniel A. Nathan

1290 Avenue of the Americas
New York, NY 10140-0050
Tel.:  (212) 468-8000
Fax:  (212) 468-7900
Brett H. Miller

*Attorneys for Chapter 11 Trustee, Louis J. Freeh*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>MF GLOBAL HOLDINGS LTD., *et al.*,<br><br>               Debtors. | Chapter 11<br><br>Case No. 11-15059 (MG)<br><br>(Jointly Administered) |
| LOUIS J. FREEH, AS CHAPTER 11 TRUSTEE OF MF GLOBAL HOLDINGS LTD., *et al.*,<br><br>               Plaintiff,<br><br>v.<br><br>JON S. CORZINE, BRADLEY I. ABELOW, AND HENRI J. STEENKAMP,<br><br>               Defendants. | Adv. Pro. No. _____<br><br>**COMPLAINT** |

Plaintiff Louis J. Freeh (the "**Trustee**"), as chapter 11 Trustee of MF Global Holdings

Ltd. ("**Holdings Ltd.**"), MF Global Finance USA, Inc. ("**FinCo**"), MF Global Capital LLC

("**Capital**"), MF Global FX Clear LLC ("**FX Clear**"), MF Global Market Services LLC

("**Market Services**"), and MF Global Holdings USA Inc. (individually, "**Holdings USA**," and

collectively with Holdings Ltd., FinCo, Capital, FX Clear and Market Services, the

"**Debtors,**" and together with their affiliates and subsidiaries wherever located, "**MF Global**" or

the "**Company**"),[1] by and through his counsel, Morrison & Foerster LLP, for his complaint (the

"**Complaint**") against Jon S. Corzine ("**Defendant Corzine**" or "**Corzine**"), Bradley I. Abelow

("**Defendant Abelow**" or "**Abelow**"), and Henri J. Steenkamp ("**Defendant Steenkamp**" or

"**Steenkamp**," and together with Corzine and Abelow, "**Defendants**") alleges the following:

### SUMMARY

1.      The Trustee brings this action against Defendants for acts and omissions that

culminated in the business collapse of the Company and the bankruptcies of the Debtors.  As

detailed herein, Defendants, in their capacities as officers, breached their fiduciary duties of care,

loyalty, and oversight over the Company, and failed to act in good faith.

2.      During the period when Defendants were running MF Global, they dramatically

changed the Company's business plan without addressing existing systemic weaknesses that

ultimately caused the plan to fail.  As part of the new business plan, and in violation of his

fiduciary duties to MF Global as the Chief Executive Officer ("**CEO**") of Holdings Ltd. and MF

Global Inc. ("**MFGI**"), Defendant Corzine engaged in risky trading strategies that strained the

Company's liquidity and could not be properly monitored by the Company's inadequate controls

and procedures.  Defendants Abelow and Steenkamp, Corzine's hand-picked deputies and the

Company's most senior officers, breached their fiduciary duties by failing to ensure that the

---

[1] The following are the U.S. subsidiaries and affiliates (along with the last four digits of each of their federal taxpayer identification numbers) that have filed petitions for relief and whose cases are being jointly administered with the case of MF Global Holdings Ltd. (1260); MF Global Finance USA, Inc. (4890); MF Global Capital LLC (2825); MF Global FX Clear LLC (3678); MF Global Market Services LLC (2193); and MF Global Holdings USA Inc. (2847).

Company's procedures and controls were adequate and could accommodate the Company's new business plan.

3.      When Defendant Corzine joined Holdings Ltd. in March 2010, MFGI, an indirect subsidiary of Holdings Ltd. operating in the United States, was the primary operating business of the Company.  MFGI had separate broker-dealer ("**B/D**") and futures commission merchant ("**FCM**") businesses.   At that time, MFGI earned revenues primarily (1) through commissions earned from executing customer orders, and (2) from interest earned on customer funds and its matched repo book.  The Company's dependence on interest rates for revenues, at a time when interest rates were low and steadily declining, had led to five consecutive quarters of losses and had caught the attention of the credit rating agencies.

4.      In September 2010, Defendant Corzine hired Defendant Abelow to be the Chief Operating Officer ("**COO**") and Executive Vice President (and later President) of Holdings Ltd. In April 2011, Corzine promoted Defendant Steenkamp, the Company's then-Chief Accounting Officer and Global Controller, to Chief Financial Officer ("**CFO**") of Holdings Ltd.

5.      When Defendants took charge of MF Global's affairs, its procedures and controls were deficient in many ways.  During their time running the Company, Defendants failed to adequately improve its procedures and controls.  For instance, the Company was unable to monitor or determine its liquidity accurately in real time, to forecast or stress-test its liquidity, and to track and record intra-company transfers of funds between the B/D and FCM operations of MFGI.

6.      Despite his knowledge that the Company's procedures and controls were weak, Defendant Corzine quickly began converting the Company to a full-service B/D and investment bank.  As part of this change in strategy and business expansion, Corzine established a

3

proprietary trading operation that he supervised and participated in extensively. However, as Corzine changed and expanded the Company's business, Defendants failed to improve its already deficient systems to accommodate the new and additional risks of this new and larger business.

7.      In response to demands from credit rating agencies, in early August 2010, Defendant Corzine represented in an earnings call that the Company would return to profitability in four to six quarters. To avoid a downgrade by the credit rating agencies and to make good on that representation while the Company was transitioning to the new business model, Corzine caused MFGI to enter into highly leveraged investments in European sovereign debt using repurchase-to-maturity financings (the "**Euro RTMs**"). The Euro RTMs allowed MFGI to book immediate income while financing sovereign debt positions through repurchase agreements, or "repos," that involved selling the securities while concurrently agreeing to repurchase them at a specified date in the future and at a specified price.

8.      Defendant Corzine was responsible for all of the Company's Euro RTM trading. After he commenced that trading, Corzine continually increased the amount of such trading to a point that severely strained the Company's liquidity. Indeed, Corzine exceeded limits on such trading imposed by the Board of Directors of Holdings Ltd. (the "**Board**") on several occasions.

9.      Defendant Corzine's Euro RTM strategy created significant liquidity risks for the Company that ultimately contributed to its downfall. Although the transactions were fully financed, the clearinghouses required a payment of margin in the form of cash or other acceptable collateral at the time the transaction was executed, and, as conditions changed, additional margin could be required. As Defendants knew, under stressed financial conditions

4

the margin demands associated with these positions could increase significantly. Ultimately, they did.

10.     Despite their awareness of these risks, Defendants failed to prepare for the risks of increased margin calls on the Euro RTM positions. The Company's Euro RTM positions increased from less than $400 million in mid-September 2010 to close to an $8.3 billion net position at the end of August 2011. When the underlying European sovereign bonds were downgraded during the summer and fall of 2011, the clearinghouses imposed steadily increasing margin calls on MFGI. In addition, Defendant Corzine's outsized European sovereign investments caught the attention of at least one of MFGI's regulators, the Financial Industry Regulatory Authority ("**FINRA**"). FINRA required MFGI to commit additional capital during the summer of 2011, further stressing the Company's already precarious liquidity position.

11.     The new proprietary trading desks established by Defendant Corzine consumed additional liquidity. For instance, from early 2011 through the summer of 2011, the Company accumulated an increasingly long list of securities that could not be financed with third party funds, requiring the Company to finance those securities with its already stretched house funds.

12.     As a result of Defendants' actions, the Company's liquidity was depleted by a combination of increased margin demands from the Euro RTMs, additional capital requirements imposed by FINRA, and the addition of new proprietary trading desks that needed increasing amounts of liquidity.

13.     The Company's procedures and controls for monitoring risk were lacking and in disrepair. Throughout their tenures, Defendants were repeatedly warned — in reports, meetings, emails, and in-person exchanges — of the failures and need for improvements in the Company's procedures and controls. Yet, instead of taking necessary steps to fix those problems,

Defendants – in violation of their fiduciary duties to the Debtors and the Company – pursued an even riskier business plan, thereby straining inadequate controls and risk monitoring systems beyond their capabilities.  Because Defendants failed to implement proper controls and procedures, they also had difficulty properly monitoring the Company's liquidity drain caused by its unprecedented high volume of proprietary trading and the Euro RTM strategy.

14.     The Defendants never informed the Board about the Company's liquidity challenges in the Company's final months, or about any deficiencies in the Company's ability to track liquidity.

15.     When FINRA's capital demand and unusually large quarterly losses were announced in the fall of 2011, the credit rating agencies downgraded the Company's debt, leading to a run on the bank by the Company's customers and trading counterparties.  During the last week of its operations, the lack of control over cash and cash movements led the Company to lose track of fund transfers and to incur a substantial customer fund shortfall.  For example, during that week, the Company satisfied its B/D's needs for additional liquidity by transferring customer funds from the FCM.  Because of the Company's deficient systems, members of the Company's Treasury Department were not aware at the time that they were using customer funds.

16.     These breaches of Defendants' fiduciary duties caused:  a potential buyer of the Company to withdraw from negotiations; the commencement of the Securities Investor Protection Act ("**SIPA**") liquidation of MFGI; the chapter 11 bankruptcy cases of the Debtors; the cessation of MF Global's business operations; and the destruction of MF Global's value as a going concern.

17.    These events inflicted material damages on the Debtors and the Company.

Between Defendant Corzine's arrival at the Company and the commencement of the

bankruptcies of the Debtors, MF Global lost well in excess of a billion dollars in value, not

including any shortfalls in customer funds.

## JURISDICTION AND VENUE

18.    On October 31, 2011, Holdings Ltd. and FinCo filed voluntary petitions for relief

under chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") in the United

States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").  On

December 19, 2011, Capital, FX Clear and Market Services filed voluntary petitions in the

Bankruptcy Court for relief under chapter 11 of the Bankruptcy Code.  On March 2, 2012,

Holdings USA filed a voluntary petition in the Bankruptcy Court for relief under chapter 11 of

the Bankruptcy Code.  The Debtors' cases (collectively, the "**Chapter 11 Cases**") are jointly

administered pursuant to Bankruptcy Rule 1015(b) [Docket Nos. 19, 298, 528] in the Bankruptcy

Court under the caption, *In re MF Global Holdings Ltd., et al.*, Case No. 11-15059 (MG).

19.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.

§§ 157 and 1334, and Rule 7001(1) of the Federal Rules of Bankruptcy Procedure (the

"**Bankruptcy Rules**").  This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §§

157(b)(2)(A), (E) and (O).

20.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

**Plaintiff**

21.    By orders dated November 28, 2011 [Docket No. 170], December 27, 2011

[Docket No. 306], and March 8, 2012 [Docket No. 548], the Bankruptcy Court appointed Louis

J. Freeh to serve as chapter 11 Trustee for each of the Debtors.  Sections 1106(a)(3) and (a)(4) of

the Bankruptcy Code require the Trustee to:

> . . . investigate the acts, conduct, assets, liabilities, and financial
> condition of the debtor, the operation of the debtor's business and
> the desirability of the continuance of such business, and any other
> matter relevant to the case or to the formulation of a plan;
>
> . . . including any fact ascertained pertaining to fraud, dishonesty,
> incompetence, misconduct, mismanagement, or irregularity in the
> management of the affairs of the debtor, or to a cause of action
> available to the estate.

22.    Therefore, the Trustee has a duty to investigate and, if necessary, to bring claims

against the current and former officers and directors of the Company.  The Trustee brings this

Complaint solely in his capacity as the Trustee and not in any other capacity.

**Defendants**

*Jon S. Corzine*

23.    Defendant Corzine served as Chairman of the Board and CEO of Holdings Ltd.

and CEO and a Director of MFGI between March 23, 2010, and November 4, 2011, when he

resigned.  Before joining Holdings Ltd., Corzine was Chairman, Senior Partner, and Chief

Financial Officer at Goldman Sachs, where he spent more than 24 years.  Corzine also served as

United States Senator from New Jersey between 2001 and 2006 and Governor of New Jersey

from 2006 to 2010.

24.    As MF Global's CEO, Defendant Corzine was ultimately responsible for the

Company's administrative, back office and technology functions, including the adequacy of the

Company's risk management and internal controls.  ("Back office" generally refers to operations

and technology units that ensure smooth settlement of transactions and maintenance of a

company's technology systems, and includes record keeping, trade confirmation, and trade

settlement.)  In a May 20, 2010 earnings press release, Corzine stated that he would "ensure the appropriate controls are in place" at the Company.  During a June 3, 2010 investor conference, he stated that risk management is "something that I've worked on most of my life and I think that we can bring . . . the operations, the systems, [and] the technology to managing risk."  As part of his duties, Corzine also stressed his commitment to improving MF Global's "client facilitation efforts" and market execution.

*Bradley I. Abelow*

25.     Defendant Abelow joined Holdings Ltd. in September 2010 as COO and Executive Vice President, and became Holdings Ltd.'s President in March 2011.  Abelow was responsible for oversight of the Company's operations, including the day-to-day execution of the Company's business strategy, and had direct responsibility for operations, including treasury operations, information technology, human resources, risk management, procurement and facilities management globally, all infrastructure-related functions.  When he became President, he assumed the additional responsibility of further developing and executing the Company's new strategic direction.

26.     Before joining Holdings Ltd., Abelow served as New Jersey State Treasurer and Chief of Staff to Defendant Corzine during Corzine's tenure as New Jersey's Governor.  He had previously been a partner and managing director at Goldman Sachs, where he managed its operations division, and prior to that its Asia operations, technology, risk and finance functions.  While at Goldman Sachs, Abelow served on the Board of Directors of The Depository Trust & Clearing Corporation.

*Henri J. Steenkamp*

27.      Defendant Steenkamp served as Holdings Ltd.'s CFO starting in April 2011. Prior to that, Steenkamp was Holdings Ltd.'s Chief Accounting Officer and Global Controller for four years.  Prior to joining the Company, he worked as an external auditor for PricewaterhouseCoopers LLP.

28.      As the head of MF Global's financial operations, Defendant Steenkamp had authority over and responsibility for the Company's financial operations, including treasury, accounting, and all global financial control and reporting functions.  These functions included monitoring liquidity, protecting customer funds, and funding MF Global's operations, including its proprietary trading.

29.      Even before he became CFO, Defendant Steenkamp was responsible for giving financial presentations to the Board and designing financial messages supporting Corzine's transition to a new business model and his Euro RTM strategy.

30.      At Board meetings held between May 2010 and February 2011, Steenkamp:  (a) presented the 2011 proposed budget together with Corzine; (b) addressed various questions raised by Board members with respect to revenues and expenses; (c) provided updates regarding forecasted results; and (d) at Corzine's request, discussed a convertible debt offering recommended by management.

31.      On January 3, 2011, three months before becoming the Company's CFO, Steenkamp drafted message points on the Euro RTMs for an upcoming Board meeting. Additionally, Steenkamp attended all but one of the Board meetings where increases in the risk limits associated with the Euro RTM portfolio were discussed.

32.     At the March 2, 2011 Board meeting, at which the Board resolved to nominate Steenkamp as CFO, Steenkamp addressed questions regarding the monthly management package, provided the directors with "color" with respect to the February 2011 results, and addressed strategy-related rationalization efforts, including the exiting of non-core businesses and the restructuring of under-performing products.

33.     At the March 28, 2011 Board meeting, at Corzine's request, Steenkamp explained to the Board the monthly management report with respect to the February 2011 results, highlighting net revenues, key drivers, compensation ratios and earnings per share, and discussed his view that the Company was better positioned than it had been in the past to take advantage of business opportunities as they arose.

**Holdings Ltd., MFGI, and FinCo**

34.     Holdings Ltd., a Delaware limited liability company, is a holding company headquartered in the United States.  In November 2005, the Company's predecessor, Man Group plc, acquired the regulated futures and commodities trading business entities of Refco, Inc.  In July 2007, Man Group plc consummated an initial public offering and changed its name to MF Global Ltd. (which was later changed to MF Global Holdings Ltd., when the company changed its place of incorporation from Bermuda to Delaware).  Holdings Ltd.'s common stock was traded on the New York Stock Exchange.

35.     MFGI, a Delaware corporation, is one of Holdings Ltd.'s principal indirect subsidiaries and primary operating businesses.  MFGI was registered with the National Futures Association as an FCM, and with FINRA as a B/D.

36.     FinCo is MF Global's financing arm.  It provided funding for MF Global's United States subsidiaries, including MFGI.  FinCo obtained funds from a variety of sources, including

the Company's revolving credit facilities and capital raises.  FinCo also provided funds used by

MFGI to post margin related to the Euro RTMs.

## FACTUAL ALLEGATIONS

### A.  Corzine Joined the Company

#### i.    MF Global Before Corzine Joined

37.    In February 2008, less than a year after MF Global went public, the Company

suffered credit rating agency downgrades, customer withdrawals, and a $10 million fine imposed

by the FCM's primary regulator, the Commodity Futures Trading Commission ("**CFTC**"), for

poor risk management practices.  As part of the relief in that case, MF Global was ordered to

implement the recommendations of an outside consultant that reviewed MF Global's internal

controls related to compliance, risk management processes, IT infrastructure, and corporate

governance.

#### ii.    Corzine Changed Senior Personnel

38.    After Defendant Corzine was named CEO and Chairman of MF Global in March

2010, he surrounded himself with persons he trusted to support his business plan.  He recruited

and hired Defendant Abelow as COO in September 2010.  Although Randy MacDonald

("**MacDonald**") was the Company's CFO, Corzine began to rely upon Defendant Steenkamp,

the Company's Chief Accounting Officer.  In April 2011, Corzine replaced MacDonald as CFO

with Steenkamp.

39.    In addition, within a year of his arrival, Defendant Corzine caused the Company

to replace the Company's Chief Risk Officer ("**CRO**"), Michael Roseman ("**Roseman**"), with

Michael Stockman ("**Stockman**").  According to its Enterprise Risk Policy (the "**Risk Policy**"),

which documents MF Global's Enterprise Risk Management approach and framework, MF

12

Global's CRO oversaw the Company's risk matters, and had "global responsibility for controlling credit, market, operational, concentration, capital, and liquidity risks" and primary authority, delegated by the Board, for market and credit risk oversight. The Risk Policy also provided that the CRO reported to MF Global's CEO and had direct access to the Board any time that circumstances would require such access.

### iii.  Corzine Introduced a New Business Model

40.     At the time Defendant Corzine joined MF Global, at least several members of the Company's Board had concluded that the Company needed to move in a new direction in order to earn revenues due to the prevailing low interest rate environment.

41.     Not long thereafter, the credit rating agencies told the Company that it needed to generate revenue growth every quarter or it would risk being downgraded, and Defendant Corzine represented in an earnings call that the Company would return to profitability in four to six quarters.

42.     Defendant Corzine identified the development and execution of principal trading — taking positions in various commodities, securities, and other instruments or products to either facilitate client trades or to attempt to earn revenues using the Company's own funds through proprietary trading — as an important part of the Company's future.  In a May 2010 earnings call, Defendant Corzine publicly acknowledged the need for improved and adequate controls to accommodate the principal trading:

> As we grow these activities we will be mindful of the necessity to enhance and reconfirm our operational and control functions and to secure the talent necessary to manage attended market risks.  I want to be clear.  I don't anticipate increasing our current risk appetite in the near term but we will encourage facilitation desks to operate more aggressively within our existing limits.

43.     In June 2010, Defendant Corzine established the Principal Strategies Group

("**PSG**") as a trading unit within MFGI to engage in proprietary trading.  The establishment of

proprietary trading operations was one step in Defendant Corzine's announced plan to diversify

the Company's revenue streams, and transition the Company to a B/D and, ultimately, to an

investment bank.

44.     In an unusual role for a CEO, Corzine actively engaged in proprietary trading, and

maintained his own trading book.  As time went on, Corzine spent a considerable amount of time

on the fixed income trading desk and trading in accounts under his control.

45.     At the December 15, 2010 Board meeting, representatives of the Boston

Consulting Group ("**BCG**"), which had been retained to advise Defendant Corzine on the

Company's future business direction, endorsed his plan for MF Global to evolve from a broker to

a B/D *en route* to becoming a full-service investment bank.  However, the BCG consultants

warned that, in order to implement that strategy, the Company needed to "[b]uild out robust risk

management infrastructure, including platforms, tools, policies, and procedures for both market

making and principalling," "[s]hore up" operations and information technology for reliability and

scalability, and provide greater management information systems and transparency in the

Finance Department through tools and systems.

46.     To pursue Defendant Corzine's strategy, MF Global hired traders and mortgage

brokers, obtained primary dealer status, and considered acquiring a commodity pool business as

well as certain partnerships.  In the end, the Company made no acquisitions, with the exception

of two small companies, while it created and dramatically expanded its proprietary trading

operations.

47.    The new proprietary traders hired by Defendant Corzine required large amounts of daily liquidity to fund their trading.  Their activities ultimately had the effect of increasing stress on the Company's liquidity.  The increased scale of the Company's operations under Corzine put additional pressure on the Company's deficient controls without producing any significantly improved revenues.

**B.    Defendants Failed to Improve MF Global's Controls**

48.    Shortly before the Company's collapse, the Internal Audit Department found that there were 176 open action items previously presented to the Audit and Risk Committee of the Board that had not yet been resolved.  The report forecasted that the inherent level of risk within the Company was increased by the likelihood that the Company's business growth was "outpacing [the] growth of the related support functions."

49.    As discussed below, Defendants knew about the Company's liquidity and capital management risks, weak control environment, and the need to address these shortcomings in connection with the planned changes in the Company's business.  Nevertheless, Defendants did little to fix these problems while implementing the major initiatives of Defendant Corzine's business plan.  The deficient systems and controls surrounding the monitoring, tracking, and forecasting of liquidity and capital management contributed to the Company's demise.

**i.    Defendants Failed to Implement the Risk Policy's Requirements**

50.    The Company's Risk Policy identified liquidity risk as the "[r]isk that the [Company], although solvent, either (1) does not have available sufficient liquid financial resources to enable it to meet its obligations as they fall due or (2) can secure sufficient liquid financial resources only at an excessive cost."

51.     The Risk Policy specifically called for a new position in the Risk Department,

Global Head of Capital & Liquidity Risk, to take responsibility for

> independent and objective assessment of liquidity risk; reviewing
> liquidity scenario analyses conducted by [the] Treasury
> [Department], as well as risk scenarios conducted by other risk
> areas (*i.e.*, operational risk, credit risk, market risk) that may lead
> to liquidity events; monitoring liquidity against limits outlined in
> the Risk [Delegations of Authority]; and presenting independent
> liquidity-risk information and intelligence through the CRO to
> senior management and the Board.

However, the Defendants, in their capacities as officers of the Company, never caused the

position of Global Head of Capital & Liquidity Risk to be filled.

52.     The Risk Policy also called for development of a Liquidity Risk Methodology

Document that would include a contingency funding plan to assess potential liquidity

requirements arising from adverse market or operational situations.  However, the Defendants

never addressed the Company's failure to develop the Liquidity Risk Methodology Document or

the contingency funding plan.

53.     Under the Risk Policy, the Company's Treasurer had the responsibility to "ensure

that effective liquidity forecasting and cash management processes are in place, documented and

functioning across MF Global, including specific processes to identify any expected cash items

that remain outstanding and appropriate action to cover any shortfall."  These processes were to

include "a liquidity plan that assesses the [C]ompany's liquidity requirements based on the

planned volume and composition of business activity for the upcoming period," and "a detailed

analysis of projected sources and uses of funds for each MF Global entity."  The Treasurer,

however, lacked the ability to complete the tasks assigned to him under the Risk Policy, as the

Company did not have the means to conduct independent liquidity monitoring and forecasting,

which were fundamental flaws and high priority risks for the Company.

16

### ii.    Defendants Knew of the Gaps in Procedures

54.    Defendants were aware of the Company's failures to implement many important components of an appropriate system of liquidity and capital controls architecture, but did not adequately respond to the clear notice they received of these weaknesses.

55.    A May 2010 report issued by the Company's Internal Audit Department addressed to Corzine and others concerning corporate governance found that MF Global's risk limitation and monitoring policy lacked key limits significant to the operation of a B/D.  An October 2010 Internal Audit report on Market and Credit Risk Management to Corzine, Abelow and others identified "High Risk" areas arising from the lack of controls over risk reporting, and alerted that market risk policies had not been updated to reflect MF Global's then-current operating environment.

56.    The Risk Department prepared an analysis of gaps between the documented and approved Risk Policy and current practices which the Risk Department presented at the May 26, 2010 meeting of the Audit and Risk Committee attended by Defendants Corzine and Steenkamp (the "**Gap Analysis**").  The Gap Analysis showed dozens of gaps between the Company's written risk-control policies as described in the Risk Policy and the Company's actual risk control practices, including the following weaknesses classified as "high" priority risks:

a.    The Company had not developed liquidity risk scenario analyses and stress tests; and

b.    The Treasurer lacked the appropriate personnel and technology to conduct independent liquidity monitoring and forecasting or economic capital risk analysis.  The Gap Analysis stated that the Treasurer "[c]annot produce accurate forecasts because underlying data is inadequate."

57.    The Gap Analysis also identified the following weaknesses, among others, as having a "moderate" priority level of risk:

17

a.   The Company's failure to hire someone to fill the important role of Global Head of Capital & Liquidity Risk; and

b.   The Company's failure to develop the Liquidity Risk Methodology Document, which was supposed to document the Company's contingency funding plan.

58.   In October 2010, a status update on the numerous gaps between the Company's policies and practices identified almost a half year earlier (the "**Gap Analysis Update**") showed that very few of the control gaps had been remedied and that the Risk Department considered some of the problems to have grown more serious. The Risk Department presented the Gap Analysis Update at a meeting of the Audit and Risk Committee attended by Defendants. Among other things, the Gap Analysis Update reported:

a.   Out of 32 gaps previously identified, only two had been resolved, and all but one of the high priority risk gaps persisted;

b.   Certain high priority risk areas, such as the need for liquidity risk scenario analyses, stress tests, and metrics to gauge return on risk-adjusted capital, remained "under development;" and

c.   The gaps in economic capital risk measurement, liquidity risk scenarios and operational risk profile had been elevated to "critical" priority status.

### iii.   Defendants Knew of Deficiencies in Liquidity Controls and Procedures

59.   More than a year after the Risk Department alerted Defendants to control deficiencies in the Gap Analysis, in June 2011, the Internal Audit Department also alerted Defendants to limitations in the Company's ability to track liquidity. According to the June 2011 Global Liquidity and Capital Management Internal Audit Report (the **"June 2011 Internal Audit Report"**), "[e]xisting liquidity monitoring and forecasting is manual and limited. Reporting capabilities to evaluate liquidity needs for transactions that are booked but not yet settled have not been fully developed." The report further found that "[e]xisting performance of

18

formal stress testing and scenario analysis is not adequate to fully assess liquidity and capital

needs." The June 2011 Internal Audit Report also warned that:

> The complexity of capital and liquidity demands have increased
> with the addition of principal trading across the [Company's]
> customer facing desks, [PSG], and other previously approved new
> businesses. These additional stresses further emphasize the need
> for a more formal and consistent approach to liquidity and capital
> management.

60.     The June 2011 Internal Audit Report also identified a "key man" risk in

connection with liquidity reporting, monitoring and forecasting tools, specifically noting that

"[t]he lack of formal reporting, monitoring and forecasting creates an unnecessarily high reliance

on key employees and increases the risk exposure should these staff members leave the

[Company]." The Internal Audit Department's concern was based on the Company's reliance on

the expertise and experience of a single employee in the Treasury Department, the Assistant

Treasurer Edith O'Brien ("**O'Brien**").

61.     The June 2011 Internal Audit Report designated Defendants Steenkamp, Abelow

and other officers reporting to them as responsible for resolving the identified issues, many of

which they never resolved.

62.     Defendants were aware that the Company lacked a formalized process for

approving new business initiatives, including determining the availability of funding for such

initiatives. Defendants also were aware that the Company needed a method of managing and

responding to capital requests from the individual trading desks. As of October 2011, the month

of the Company's collapse, Defendants had not established such a method or process, and

requests continued to be handled informally.

      **iv.**     **Defendants Knew of Treasury Department Deficiencies, including the Use of Ad Hoc Liquidity Monitoring Tools**

63.     As Defendant Corzine orchestrated the expansion of MF Global's proprietary

trading, the Company also failed to integrate or upgrade its various technology systems and

platforms for monitoring treasury operations, liquidity risk, and financial regulatory functions.

According to a Finance Department officer, the Treasury Department's systems were a

"hodgepodge of systems and processes without a design."  The Treasury Department's systems

for managing funding and cash flows produced inaccurate books and records, and the Finance

Department often had to make manual corrections in order to ensure that the Company's books

and records were accurate.

64.     In November 2010, the CFO of MFGI, Christine Serwinski ("**Serwinski**")

reported to Defendant Steenkamp her concerns about the shortcomings in the Treasury

Department's systems ("**November 2010 Report**").  Serwinski reported problems with FinCo

Treasury's back office bookkeeping system, which recorded intercompany lending and client

margin financing transactions.  These reported problems included an increase in the number and

dollar amount of bank reconciling items since July 2010, resulting in increased manual journal

entries and accounting adjustments, delays in the close process, and incorrect posting of items.

In the November 2010 Report, Serwinski stated that attempts to address these items and other

issues around the accurate and timely reporting of the FinCo balances have been "to no avail,"

and that "[a]t this point, confidence in the ability to accurately and timely report balances is

declining."

65.     In the November 2010 Report, Serwinski also informed Steenkamp of the

circumstances of an October 2010 $25 million wire from MFGI's house account to MF Global

Holdings Hong Kong Ltd., which resulted in MFGI overstating its excess net capital, and

crossing the internal global capital thresholds.  Despite several email exchanges and discussions,
the Finance Department was not able to confirm the exact nature of the transaction.

66.      Defendant Corzine was also aware that the Treasury Department lacked the
necessary systems and technology to conduct accurate liquidity monitoring and forecasting
across its global operations as early as May 2010, when the Gap Analysis was delivered to the
Board.  Company management, however, did not begin to discuss hiring a vendor to develop an
integrated global treasury system until July 2011, and did not schedule its vendor selection and
implementation phase until February 2012.

67.      In the absence of an automated global treasury system, Treasury Department
officials manually tracked the movement of money among the Company's legal entities.  They
determined and reported the B/D's liquidity through an ad hoc daily snapshot, which included
the sources and uses of that liquidity.  A Treasury Department official started compiling this
snapshot, known as the "liquidity dashboard," towards the end of 2010 at Defendant Corzine's
request.  The liquidity dashboard was distributed daily to senior management, including
Defendants, and provided a very simplistic and, as Defendants knew, sometimes inaccurate view
of the cash available to the B/D.  For example, the liquidity dashboard treated different types of
capital similarly, without explaining that certain types of capital (working capital as opposed to
regulatory capital) are less available for certain business uses than other types, potentially
resulting in a misleading report.  In addition, the liquidity dashboard considered certain funds
held by the FCM to be an available source of liquidity, even though there are strict rules about
what the FCM could do with these funds.  Therefore, these funds might not be available to the
B/D.

68.     Senior officers, including Defendant Corzine, relied upon the liquidity dashboard as the only source of "real time" information about the Company's liquidity, even though they knew that the figures in it were estimates and not always timely or accurate.  Indeed, as discussed above, the June 2011 Internal Audit Report criticized the Company's reliance on "ad hoc tools" and the professional expertise of key personnel to manage liquidity.

69.     Apart from the limitations of the liquidity dashboard, MF Global had continuing problems monitoring, gathering, and internally reporting accurate financial data.  For example, the Finance Department could not produce a high-level overview of cash flows for a defined period because the Finance Department did not have the systems needed to generate such a report.

70.     As discussed below, MFGI's B/D began to rely on funding from MFGI's FCM to finance its business.  However, intraday transfers between the FCM and the B/D were recorded through nothing more formal than email communications and manual data entry systems.

71.     The Treasury Department also lacked a tool to monitor the Company's leverage more frequently than at the end of each quarter despite the fact that leverage was one of the measures on which the credit ratings agencies and analysts focused in assessing the Company's performance.

72.     These problems were exacerbated in the weeks preceding the Company's collapse, when the Company was unable to properly record and track the financial data that might have helped avoid the ultimate customer fund shortfall.

     **v.     Defendants Knew that the Company's Regulatory Reporting Controls were Inadequate**

73.     The Financial Regulatory Group, a division within the Finance Department, was responsible for ensuring that MFGI complied with all of the regulatory requirements applicable

to a B/D and an FCM.  In preparing the required regulatory reports for the Company, the

Financial Regulatory Group relied heavily on end-user computing tools ("**EUCs**"), including

Excel spreadsheets and databases, to perform many of their reporting and reconciliation duties.

74.    In May 2011, the Internal Audit Department alerted Defendants that the

Regulatory Reporting team lacked controls over the ability to modify and access key EUCs.  The

Internal Audit Department reported that without adequate controls, EUCs "may not maintain the

integrity of the data and therefore there is an increased chance that decisions may be made on

inaccurate information or that monitoring reports may be incomplete."  Defendants never fixed

the manual cash processing issues that confronted the Finance Department.

75.    The May 2011 Internal Audit report also put Defendants on notice of serious

control deficiencies in the preparation of the regulatory reports, specifically with regard to the

process of gathering information.

76.    All the Defendants received the May 2011 Internal Audit report, which

designated Defendant Steenkamp as the person responsible for all the issues identified.  Despite

their awareness of these issues, Defendants never took the necessary steps to remedy the

situation before the Company's collapse in October 2011.

### vi.    Defendants Knew that the Company's Back Office Systems Were Flawed

77.    MF Global used a variety of back office systems, rather than one global system

for the clearing and settlement of trades.  The Company's various back office operations

platforms were antiquated and showed only limited position and account information, thereby

impeding the effective monitoring and forecasting of Company liquidity.  A July 2011 Internal

Audit report faulted one of the systems for a "[l]ack of appropriate controls relating to the highly

manual processes associated with [mortgage-backed securities/to-be-announced mortgage-backed securities ("**TBA**")] trade matching, allocations and settlement of open TBAs."

78.     Fail reports generated by the systems, which indicated trades reaching the settlement date, but which had not yet settled, were defective in that they:  (1) showed false positives in the system (they reported trades that had not reached their settlement date); and (2) did not provide adequate descriptions of the reasons trades failed.

79.     These system deficiencies required operations personnel to engage in a manual process of generating the records necessary to clear and settle transactions, such as through exchanging a continuous stream of emails.  The manual nature of this process made clearing and settlement significantly more difficult during October 2011 when literally hundreds of transactions had to be handled through this process.

80.     As the Company struggled to meet its financial obligations in the wake of ratings downgrades in October 2011, the limited systems used by back office staff exacerbated these problems.  No plan to fix or replace the Company's back office systems with a single adequate system was implemented by October 2011.

**C.  Defendants' Strategy Exposed the Company to Excessive Risks**

**i.     Corzine Used the Euro RTM Strategy as a Revenue-Generating Bridge**

81.     Not long after he arrived at the Company, Defendant Corzine met with MF Global's senior traders to discuss ways to improve the Company's profitability, address pressures from the credit rating agencies to generate revenues, and fund the new trading desks and product groups Corzine believed to be necessary to develop the Company into an investment bank.

82.    As a result of these discussions, Defendant Corzine decided that the Company would trade in the sovereign debt of European countries by using RTMs to purchase European sovereign debt.

83.    Defendant Corzine portrayed the European sovereign investments as a way to "bridge" the Company's revenues while MF Global was transitioning from a broker making money on interest rates and commissions to a B/D and investment bank that generated revenue through other means.

84.    The Euro RTM strategy was Defendant Corzine's idea and a prime focus of his attention.  Corzine caused MFGI to enter into the Euro RTM trades.  On a regular basis, Corzine received information on potential profit opportunities for certain country positions from the fixed income traders at MF Global's United Kingdom affiliate, MF Global UK ("**MFG UK**").  Corzine then communicated directly with one of the Company's proprietary traders or the MFG UK fixed income trading desk regarding the Euro RTM trades and instructed them when to enter and exit various positions.  Other than this limited involvement by the fixed income traders and the proprietary trader, Corzine was the sole person involved with the Euro RTM trading.

85.    Although a "repo" typically is accounted for on a balance sheet as a collateralized financing and increases balance sheet leverage, a repo-to-maturity is accounted for as a sale.  In accordance with the treatment of sales mandated by Generally Accepted Accounting Principles ("**GAAP**"), the European sovereign securities were removed, or "derecognized," from the Company's balance sheet, and the gain on the Euro RTMs was recognized as of the date the transaction was entered into, leading to the recognition of revenues at the outset of the transaction.  The Company's revenues on these transactions consisted of the difference between the price of the securities and the cost of financing their purchase.

25

86.     An analysis of the Company's income (and losses) over the relevant time period indicates that Defendants relied heavily on the Euro RTM income to report improved earnings. For example, for the quarter ending March 31, 2011, the Euro RTM income allowed the Company to cut its net loss from approximately $92 million to approximately $46 million.  For the quarter ending December 31, 2010, the Euro RTM income allowed the Company to cut its net loss from approximately $29 million to approximately $5 million.  For the quarter ending September 30, 2010, the Euro RTM income cut the Company's net loss from approximately $54 million to approximately $39 million.  For the quarter ending June 30, 2011, the Euro RTM income allowed the Company to report net income of $13 million, instead of a net loss of more than $23 million.

87.     Defendants' strategy of meeting earnings targets by relying on the Euro RTM revenues was inherently unsustainable over the long term because each new revenue-producing position required the posting of initial margin, which tied up liquidity for the duration of the investment and introduced the possibility of future margin calls (variation margin, and potentially more initial margin).

88.     During several fiscal quarters between 2010 and 2011, Defendant Corzine placed Euro RTM trades at or near the end of the quarter in order to generate revenue for that quarter and prop up the Company's apparent financial health.  For example, in the last four days of the quarter ending March 31, 2011, the Company placed Euro RTM trades worth approximately €1.85 billion, or approximately $2.62 billion.  Of that amount, on March 31, 2011 alone, the Company placed several large Euro RTM trades worth approximately €725 million, or approximately $1.03 billion.

89.     At the time MFGI began acquiring the European sovereign debt positions through its agent MFG UK, each of the sovereign debt issuances was rated as investment grade. Accordingly, MFGI was required to post only a small initial margin payment for these trades — as low as five percent of the face amount of the securities to be financed — which allowed the Company to build a highly leveraged portfolio with little up-front cost.

90.     Once it entered the Euro RTM positions, MFGI faced the risk that the clearinghouses or counterparties that financed the purchase of the Euro RTMs would demand additional margin. Additional margin could be demanded in numerous situations: (1) increased initial margin could be required by the clearinghouses if they determined that the Company had become less creditworthy; (2) increased initial margin could also be required by the clearinghouses if the clearinghouses determined that the risk inherent in the underlying security had increased; and (3) variation margin could be required based on the decline in market value of the underlying security. To meet these increased funding needs, MFGI turned to FinCo for cash. Accordingly, financing the acquisition of securities through the use of repos had the potential to create a significant liquidity risk for MFGI and the Company as a whole.

91.     Because MF Global was at risk of a downgrade at the time it entered the Euro RTMs, the margins associated with these investments had the potential to reach extraordinary levels. The rules of the Company's frequent clearinghouse for the Euro RTM transactions, LCH.Clearnet ("**LCH**"), provided that initial margin would be increased in connection with changes to a company's credit rating according to a formula: the initial margin would be multiplied by 110% for a company downgraded to an average rating of below BBB-, and 200% for those downgraded to BB+. Any downgrade below BB+ could lead to the clearinghouse requiring the company to exit the clearinghouse and terminate its open accounts.

27

92.    The capital used to finance the margin on Euro RTM positions was essentially

trapped, because MFGI could not unwind these trades before maturity without sustaining an

unfavorable GAAP earnings treatment.

93.    For its short-term liquidity needs, MF Global relied on two separate revolving

credit facilities:  (1) a $1.2 billion unsecured committed revolving credit facility ("**RCF**") for

which Holdings Ltd. and FinCo were the borrowers; and (2) a $300 million secured committed

RCF for which MFGI was the borrower.  However, the RCFs were intended to serve only as

backstops for extraordinary situations, "a liquidity pool and not a component of [the Company's]

long-term capital structure," as Defendant Corzine stated in a February 3, 2011 earnings

conference call.  They were not intended to serve as a permanent source of liquidity.

### ii.    Corzine Rapidly Accelerated His Euro RTM Strategy

94.    Between September 2010 and June 2011, Defendant Corzine made frequent

requests to the Board to increase the "risk limits," that is, the maximum size of the position that

the Company could take in European sovereign positions, including Euro RTMs.  Thus, Corzine

rapidly escalated the size of the Company's positions and frequently brushed up against — and

occasionally exceeded — those limits.

95.    All three Defendants attended most Board meetings discussed herein, and were

fully aware of all liquidity stress projections and Treasury and Finance Department liquidity

updates provided to the Board during this period of time.

96.    Defendant Corzine first began trading in European sovereign debt through RTM

transactions in September 2010, the first time the Company had ever done so.  By the late

summer or early fall of 2011, the Euro RTM portfolio had grown to a gross figure of $11.7

billion, with approximately $3.5 billion in hedges, thus accounting for a net position of $8.2 billion.

97.     As the Company's European sovereign positions and limits, which were less than $500 million in March 2010, approached $1.5 to $2 billion in mid-September 2010, Roseman, the Company's CRO, recommended to Corzine that the level of such trading be brought before the Board due to his concerns about the liquidity and capital risks associated with these positions. Roseman met with Corzine to express his concerns, and they both agreed to consult the Board.

98.     The Board first approved an increase in the European sovereign risk limit (which included Euro RTM positions) to $4.5 billion at its September 22, 2010 Executive Committee meeting.

99.     Less than two months after this risk limit increase, on November 8, 2010, Defendant Corzine requested and received from the Executive Committee an additional increase in the European sovereign risk limit to $4.75 billion.  In addition to approving the increase, the Executive Committee restricted additional new purchases of Irish and Portuguese debt to €200 million (these particular limits were set in euro currency at that time) without further approval of the Board.

100.    The Euro RTM investments began to generate liquidity demands shortly after the Company commenced the trading strategy.  In November 2010, the LCH raised the initial margins required on Irish bonds three times from 7% to 15%, then to 30%, and then to 45%, which required the Company to provide additional margin.  Around this time, and based partly on the LCH's decision, Roseman estimated potential margin calls associated with the Euro RTM investments of $524 million.

101.    The liquidity demands and risks of the Euro RTM portfolio were exacerbated when Defendant Corzine lengthened the maturities of the investments.  The maturities of the positions that Corzine put on at the beginning of the Euro RTM investments in September 2010 did not exceed twelve months, but, beginning in December 2010, the maturities lengthened up to twenty-one months, at the same time that the amount of these transactions increased.  Thus, the Euro RTMs steadily increased the amount of liquidity tied up, and the amount of time liquidity was tied up.

102.    The Defendants assured the Board that the Company had sufficient liquidity, including its RCFs and other credit lines, to manage even the worst-case scenario.  At one Board meeting, Defendant Corzine disagreed with Roseman's risk scenarios, claiming that the Risk Department's worst-case liquidity stress scenario was not realistic.

103.    In November 2010, Defendant Corzine informed Roseman that he would no longer report directly to him, but would report instead to Defendant Abelow, the Company's COO.  Roseman disagreed with the change in the reporting line, viewing it as disempowering the CRO and demoting both the position and the Risk Department as a whole.  Roseman expressed his objections to this reporting change to Corzine.

104.    At the end of January 2011, Roseman was notified that he was being replaced by a new CRO, Stockman, effective immediately.  When Stockman became the Company's CRO, he also reported directly to the COO, Defendant Abelow.

105.    At the January 27, 2011 meeting of the Audit and Risk Committee, the Board and Defendant Corzine agreed that no additional Euro RTM transactions would be placed unless Corzine sought the Board's approval on additional positions.  This action reflected increased concerns among the Board members about the Company's Euro RTM exposure.

106.   Very soon after he joined the Company, Stockman was asked by Defendants Corzine and Abelow to prepare a request for consideration at the Board's March 2, 2011 meeting to increase the European sovereign risk limit from $4.75 billion to $5 billion and to request a temporary increase to $5.8 billion until March 31, 2011.  Stockman supported the overall risk limit increases proposed at the March 2, 2011 Board meeting.  Stockman's liquidity scenarios projected potential margin calls of between approximately $297 and $761 million, while the total margin funding posted for the portfolio at the time was approximately $105 million.  Stockman also concluded that an approximate 15% increase to projected margin needs outlined under two risk scenarios developed by the Risk Department at this time had to be applied to account for the temporary growth of the portfolio to $5.8 billion until March 31, 2011.  Based on the assurances he received from the Finance and Treasury Departments, Stockman believed that the Company had sufficient liquidity to cover those scenarios.

107.   The Board approved the requested permanent and temporary risk limit increases, but directed that management seek advance approval from the Board or the Executive Committee if it wanted to exceed the new limits set or significantly add to the positions beyond the scheduled maturity dates of existing positions.

108.   Only three weeks after the March 2, 2011 Board meeting, during a March 23, 2011 meeting of the Executive Committee, Defendant Corzine again sought to expand the risk limits, requesting an extension of the temporary increase in the overall limit of $5.8 billion through September 30, 2011.   On March 18, 2011, Stockman expressed to Abelow his discomfort at the frequency of Corzine's risk limit increase requests.

109.   The Executive Committee approved Defendant Corzine's request to extend the temporary $5.8 billion limit until September 2011, at which time the limit was scheduled to

revert to $5 billion, provided that the maturities of the positions did not extend beyond December

2012.  The Executive Committee also approved an increase in the Italian sovereign limit —

within the overall Euro sovereign limit — from $1.8 to $3.1 billion; at the March 2 Board

meeting, the Italian limit already had been increased from $1.5 to $1.8 billion.  In March 2011,

Corzine placed $2.94 billion in Italian sovereign RTM trades.

110.    On March 31, 2011, only eight days after the March 23 Executive Committee

meeting, Defendant Corzine again sought the Board's approval to increase the Belgian limit from

$500 million to $1 billion.  This request was above and beyond the $5.8 billion limit only

recently established for Ireland, Portugal, Spain, and Italy.

### iii.    The Euro RTM Strategy Created Increasing Liquidity Demands

111.    Stockman highlighted the potential increases in margin demands resulting from

the Euro RTM strategy during his presentation at the May 11, 2011 Board meeting.  Stockman

indicated a total margin funding need between March 1 and May 5, 2011 of $167 million — up

from $105 million — and noted that the LCH had increased the initial margin, or "haircut," for

Portugal to 45%, or $500 million.  MF Global only was able to avoid posting this increased

margin by transferring the positions to another clearinghouse, Eurex.

112.    Starting at the end of May 2011, Defendant Corzine caused the Company to enter

into short Euro RTM positions (called "reverse repos-to-maturity," or "**RRTMs**") in order to

reduce the Company's net Euro RTM positions and the margin demands on these positions.

Corzine also took gross long positions in excess of the net risk limits set by the Board.  These

gross long Euro RTM positions ultimately reached $12.5 billion in or about the end of July 2011.

113.    Defendant Corzine called an off-cycle telephonic meeting of the Board for June 6,

2011, to request yet another increase in the European sovereign risk limit.  At the June 6 Board

meeting, Corzine recommended that the Euro RTM portfolio be remodeled into three tiers: Tier 1 encompassed Belgium, Spain, and Italy, the countries with higher credit ratings; Tier 2 encompassed Ireland and Portugal; and Tier 3 encompassed Greece. Corzine also requested an overall $1 billion risk limit increase, made up of a $700 million increase for Tier 1 and a $300 million increase for Tier 2.

114.   While the Board approved an increase in the Tier 1 limit of $1 billion, $300 million more than the $700 million requested by Defendant Corzine, the Board approved an increase of only $200 million for the less favorable investments in Tier 2, $100 million less than the $300 million requested by Corzine. The Board did not approve Corzine's requested limit increase for Portugal. The overall limit was thus increased to $8.5 billion. The Board also set a maturity limit for Tier 1 countries of December 31, 2012, and a maturity limit for Portugal and Ireland investments of June 30, 2012.

115.   At the time of the June 6, 2011 Board meeting, the initial and variation margin requirements for the Company's Euro RTM positions amounted to approximately $200 million, with an anticipated additional $50 million required for positions added after the limit increases. Under the Risk Department's risk scenarios, potential funding requirements increased substantially as a result of the proposed limits, to as high as $1 billion.

116.   During the June 6 Board meeting, all Defendants addressed questions from the Board about the proposed European sovereign risk limit increases. Defendant Steenkamp indicated that the Company would have the ability to finance even the most severe stress scenario presented by the Risk Department. A little more than four months later, after the portfolio continued to increase in size, the Company was no longer able to satisfy the liquidity needs presented by the stress scenarios.

33

117.    On or about June 6, 2011, Defendants also were aware that the Company's long positions had a much longer duration than the offsetting short positions, the RRTMs. This presented the risk of increased margin demands and pressure on the Company's liquidity because, when the short hedges matured, they would no longer offset the margin demands on the long positions. In a June 6, 2011 email, Defendant Steenkamp explained to Defendants Corzine and Abelow, among others, the impact on these hedges of a downgrade in the Company's rating to below investment grade:

> [T]here could be an impact on the reverse RTM netting trades as these are to different maturities than the original RTMs. The potential issue is whether some counterparties will choose not to roll over transactions or the trading counterpart can't trade with us due to our rating. If this were to happen, then [MFGI] could lose its netting benefit on these reverses and thus be subject to higher margins, thereby increasing liquidity needs for the [B/D].

118.    In the same email, Defendant Steenkamp also stated that if the Company was unable to roll netting trades for certain Irish and Portuguese positions, then the Company might need an additional $313 million in liquidity, which could require a drawdown on the Company's RCFs.

119.    In the summer and fall of 2011, the value of MF Global's Euro RTM positions deteriorated when the European sovereigns were downgraded. As a result, the Company received several large margin calls requiring the Company to post additional variation margin. These margin calls included the following:

    a.    On July 14, 2011, a $150 million margin call on Portuguese positions;

    b.    On September 6, 2011, a $33 million margin call on Italian positions;

    c.    On September 13, 2011, a $28 million call on Italian positions; and

    d.    On September 20, 2011, a $20 million margin call on Italian and Portuguese positions.

34

120.    Between September 29 and October 3, 2011, Societe Generale, a European bank,

stopped providing financing for the Company's Euro RTM portfolio.  To cover a $440 million

financing shortfall, the Company drew on the unsecured RCF.

121.    In late October 2011, the clearinghouses on the opposite side of MF Global's

Euro RTM trades required even more margin after the Company's credit rating was downgraded.

122.    Overall, margin requirements increased dramatically between March and August

2011.

   a.  On March 2, 2011, the total funding requirement for the Euro RTM portfolio
       was approximately $105 million;

   b.  By May 5, 2011, the funding requirement jumped to $167 million;

   c.  Only one month later, by June 6, 2011, the funding need increased to $200
       million with an anticipated additional $50 million associated with the
       increase in risk limits sought by Corzine from the Board of Directors;

   d.  By July 17, 2011, the funding requirement for the Euro RTM portfolio
       reached $450 million;

   e.  On July 20, 2011, the funding requirement was $480 million;

   f.  By July 29, 2011, the funding requirement reached $592 million; and

   g.  At the August 11, 2011 meeting of the Board of Directors, Stockman
       reported a $500 million funding requirement, a more than a threefold
       increase since May 5, 2011, and almost a fivefold increase since March 2,
       2011.

123.    In the same time period between March and August 2011, analyses conducted by

the Risk Department indicated similarly escalating potential margin exposure under various

stress scenarios.  For instance:

   a.  On March 2, 2011, Stockman projected potential margin calls between $297
       and $761 million, with 15% additional margin projections for the temporary
       increase of the portfolio to $5.8 billion;

35

b. By May 5, 2011, the projected margin demands associated with one of the two stress scenarios developed by the Risk Department had increased by $34 million;

c. By June 6, 2011, potential funding needs had grown from $331 million to $500 million, and from $664 million to $1 billion under the two stress scenarios;

d. By July 13, 2011, Risk Department scenarios showed potential funding requirements for the Euro RTM positions of between $988 million and $1.6 billion, exceeding, for the first time, the limits of the Company's unsecured RCF;

e. By July 21, 2011, the projected margin funding requirements under the various stress scenarios developed by the Risk Department were between $1.1 billion and $1.8 billion, a substantial increase from the previous week, exceeding the combined limits of both of the Company's RCFs;

f. On August 11, 2011, potential funding exposure on the portfolio ranged between $746 million and $1.43 billion under two of the Risk Department's stress scenarios; and

g. Between May 5 and August 8, 2011, potential funding needs associated with the Euro RTM portfolio had doubled under the two stress scenarios from $331 million to $746 million, and from $665 million to $1.43 billion, respectively.

124. Through the Euro RTM investments, Defendant Corzine exceeded the Board-approved limits for European sovereign investments on a number of occasions, including the following:

a. On October 1, 2010, the Company breached the Irish and Spanish limits. The Irish breach amounted to $79 million, or 16% of the country limit. This was shortly after the Executive Committee approved limit increases at the September 22, 2010 meeting;

b. At the end of November 2010, the Company breached the Italian limit by $50 million;

c. On March 31, 2011, the Company breached the overall European portfolio limit by $184 million; and

d. In April and May of 2011, the Company breached the Italian limit by about $400 million, and the Spanish limit by approximately $200 million.

125.    Defendant Corzine also exceeded the gross risk limits — the combination of long and short positions — set by the Risk Department.  For instance, on February 3, 2011, the Company breached the Spanish gross limit of $1.75 billion by approximately 10%.

### iv.    Defendants Disregarded the CRO's Recommendations and Warnings Concerning the Euro RTM Strategy

126.    As the European credit market further deteriorated over the summer of 2011, Stockman began to believe that it would be prudent for the Company to mitigate the increased risks associated with its European sovereign debt trading position, and to consider entering into hedging transactions to reduce the Company's exposure.  Stockman convened two meetings, on July 13 and 21, 2011, with Defendants Corzine, Abelow (who attended only the second of those meetings), and Steenkamp, and other Company managers, to discuss the risks and exposures of the Euro RTMs, stress scenarios, and the possibility of hedging the positions.

127.    During those meetings, Stockman highlighted a number of risks associated with the Euro RTM positions, including the risk of being unable to extend or replace maturing short positions in Italian or Spanish bonds, the need to rectify breaches of the risk limits, and the need to engage in additional hedging and risk-reducing strategies.

128.    At those meetings, Defendant Corzine challenged Stockman's analysis, and declared the Risk Department's scenarios unrealistic because they did not take into account mitigating actions that might be taken, such as unwinding the positions in response to increasing margin requirements (which likely would have resulted in a loss).

129.    At the time of the July 13, 2011 meeting, stress scenarios created by the Risk Department showed potential funding requirements for the Euro RTM positions of between $988

million and $1.6 billion.  These potential funding requirements had increased from between $542 million and $1.1 billion under prior Risk Department stress scenarios.

130.    Following the July 13, 2011 meeting, Stockman recommended longer-dated hedging of the Italian and Spanish bonds and a reduction in the Company's approximately $3 billion concentration in Italian bonds set to mature on December 31, 2012.  Stockman also reiterated that margin calls remained the main risk associated with these positions.

131.    In a July 17, 2011 email to all three Defendants, Stockman recommended that the trading desk and the Treasury and Finance Departments develop contingency plans in the event of significantly increased margins on the Euro RTM positions.  Stockman also stated in the email that the funding requirement for the portfolio as of the July 13 meeting had been $450 million.  Contrary to the CRO's advice, Defendants failed to engage in relevant contingency planning until it was too late.

132.    During the July 21, 2011 meeting, the second called by Stockman, he reported Euro RTM funding requirements of $480 million, a $30 million increase in a span of eight days.  Stockman also revised his assessment of the projected margin funding requirements under the various stress scenarios to between $1.1 billion and $1.8 billion, a substantial increase from his assessment of eight days earlier.  Stockman warned that MFGI might be unable to replace RRTMs that were maturing and that, if MFGI no longer had the RRTM positions, it faced the risk of initial margins increasing from $248 million on each maturity date to a peak of $860 million on September 28, 2011.

133.    Despite Stockman's warnings throughout the summer of 2011, and despite Defendants' acute awareness of the increased liquidity risks posed by the Euro RTM strategy, Defendants failed to reduce the Company's exposure through hedging or otherwise.

134.    Instead of reducing the Company's risks in the face of these warnings, Defendants further increased the Company's exposure.  On July 29, 2011, after the two meetings with Stockman, and after Stockman again told Defendant Corzine about the need to increase hedging, the Company purchased an additional $200 million of Italian bonds, a position which the Company did not hedge.

135.    The following day, July 30, 2011, Stockman sent an email to Defendant Corzine, copying Defendant Abelow, stating that he had noticed the additional $200 million Italian bond purchase and that he was "not currently supportive of buying more sovereigns."  At the time, the Risk Department's updated stress scenarios showed incremental liquidity needs for these positions of $250 million and $1 billion, in addition to the already posted margin of $600 million.

136.    Stockman recommended to Defendants Corzine and Abelow that the Company stop buying more Euro RTMs until it could assess how to proactively manage initial margins. Stockman continued to advocate setting long-dated hedges to reduce sovereign and funding risk.

137.    On August 3, 2011, Defendant Abelow requested information from the Risk Department about one of the liquidity stress scenarios for the Euro RTM portfolio.  In response, Stockman told Defendant Abelow that the Company now projected a $1.6 billion potential funding requirement, $1 billion more than previously projected under one of the stress scenarios. Stockman said that, if the Company could not find counterparties for its RRTM margin netting transactions for Italian and Spanish bonds, the Company could be required to provide an additional $250 million, for a total funding need closer to $2 billion.

### v.    The Board Halted Further Euro RTM Trading

138.    At an August 11 Board meeting, the Board halted further growth of the Euro

RTM portfolio, and expressly prohibited Defendant Corzine from using previously-approved but

unutilized risk limits.  At that meeting, attended by Defendants, management again claimed that

the Company had a strong liquidity position and sufficient liquidity through its RCF and other

sources to manage even the most severe liquidity stress scenarios presented by Stockman.

139.    As of the August 11, 2011 Board meeting, the Risk Department's stress scenarios

forecasted a potential $1.43 billion funding requirement.  This amount was in excess of the total

liquidity available under the Company's secured and unsecured RCFs.  Moreover, as of that date,

the total funding need under the stress scenarios had more than doubled from scenarios presented

in May 2011.

140.    At all times between December 2010 and October 2011, while the Company's

European sovereign risk limits were increased, Defendant Abelow was the direct supervisor of

the CRO and was substantively involved in European sovereign risk limit discussions.  Stockman

kept Defendant Abelow informed about various market developments, Board member inquiries

and interactions, liquidity risk scenarios, and interactions with Defendant Corzine regarding the

Euro RTM strategy.  Also, as the Risk Department developed stress scenarios for the Euro RTM

portfolio, Defendant Abelow regularly met with Stockman to discuss the stress scenarios.

Defendant Abelow also was aware of Stockman's hedging advice in or about July 2011.

141.    According to the Company's own analysis, as of September 30, 2011, the

Company's Euro RTM holdings constituted 460% of the Company's equity and 13.9% of its

quarter-end assets, levels that were greatly disproportionate to the levels of other larger and

better-capitalized institutions.

### D.  Other Actions by Defendants That Caused the Company's Collapse

#### i.  The HTM Portfolio and "Box" Securities Challenged the Company's Ability to Properly Manage Its Liquidity

142.  Before its collapse in October 2011, the Company was deluged by increasing

margin demands resulting from the Company's Euro RTM positions and additional capital

charges required of MFGI by regulatory agencies.  The Company's ability to safely manage its

liquidity was further threatened by the addition of new trading desks that dealt in securities that

were difficult to finance, and increased risk-taking in its hold-to-maturity ("**HTM**") portfolio.

143.  The level of securities held that could not be financed, referred to as securities

held in "the box," dramatically increased in the three months preceding the Company's collapse

in October 2011.  Defendants Steenkamp and Corzine held frequent discussions with other

members of management regarding the box securities.  During these discussions, Defendant

Corzine focused on optimizing liquidity, that is, trying to find ways to maintain the positions,

rather than reducing the Company's positions in these securities because of the growing pressure

the box securities were putting on the Company's liquidity.

144.  Defendant Corzine also caused the Company to increase its risk-taking by

investing in certain corporate securities in the HTM portfolio, which held the potential to provide

a better rate of return while also increasing the funding risk for the HTM portfolio.  When the

corporate securities in the HTM portfolio were downgraded and became ineligible for investment

of customer funds, the Company needed to find adequate funding for these securities through

third parties.

145.    The size of the HTM portfolio also increased during the period just before the

Company's collapse in October 2011, from about $6 billion in assets at the beginning of June

2011, to about $8.6 billion by October 3, 2011.  This increase in the HTM portfolio's size also

contributed to the Company's liquidity challenges, since MF Global primarily funded the HTM

portfolio holdings through repos, which required additional margin to finance them, and

additional liquidity to fund the unfinanced portion.

<strong>ii.    Defendants Failed to Respond to the Company's Liquidity Challenges Long Before Its Collapse in October 2011</strong>

<strong>a.    Defendants Received Regular Reports Showing Liquidity Stresses</strong>

146.    Defendants were on notice and knew of the many risks, especially to liquidity,

inherent in the Company's business and investment strategy, and were aware of the gaps and

inadequacies in the Company's control environment.  Nevertheless, Defendants did little or

nothing to strengthen the Company's controls or ability to mitigate these risks.

147.    On a daily basis in 2011, Defendants were informed about the Company's

liquidity stresses through the liquidity dashboard and frequent discussions.  The dashboard

reflected, albeit inaccurately, the size of the unfunded box, the Euro RTM-related margin calls,

the impact of proprietary positions on liquidity, other uses of liquidity, and the extent of the draw

on the Company's RCF to alleviate liquidity pressures.

148.    Defendants Corzine and Steenkamp were on notice of the pressure that the

increased proprietary trading was placing on the Company's capital resources.  They received

Capital Risk Incident Escalation Reports, which indicated decreasing levels of surplus capital,

almost daily in July and August 2011.  Those reports informed Defendants Corzine and

Steenkamp that the fixed income, equity, PSG, and asset-backed securities and mortgage-backed

securities desks were extensive users of the Company's capital, and sometimes dramatically

42

exceeded their assigned capital limits. For instance, on August 25, 2011, a Capital Risk Incident

Escalation Report indicated that the Fixed Income proprietary trading desk was using $214.2

million of capital against a $75 million limit, while the equity proprietary trading desk was using

$27 million in capital against a $10 million limit.

149.    Defendants failed to implement a system to monitor capital limit utilization or

breaches in real time to alleviate these pressures.

### b. Defendants Relied on Intra-Company Transfers and Other Actions to Fill the Liquidity Gaps

150.    The Company's Euro RTM strategy and resulting exposure attracted the attention

of MFGI's regulator, FINRA, in May 2011. Shortly after learning of the Company's large

European sovereign debt exposure, FINRA also learned that the Company was not reserving any

capital for these trades. In August 2011, FINRA, with the support of the U.S. Securities and

Exchange Commission ("**SEC**"), required MFGI to take a $255 million capital charge on the

Euro RTMs.

151.    When FINRA and the SEC notified MF Global that the new capital charge

applied retroactively, MFGI became undercapitalized by $150.6 million as of July 31, 2011. The

retroactive charge required the Company to file net capital deficiency notices with two of its

regulators, the SEC and the CFTC, for the prior period and to restate its filed regulatory reports

for the prior period.

152.    After raising $650 million through two public debt offerings in August 2011, the

Company continued to maintain very little cash on hand and increasingly relied on the FCM to

fund the B/D. Close to $400 million of the public debt raise proceeds was used to inject capital

into MFGI for purposes of satisfying FINRA's capital demand, to cover margin on the positions

transferred from MFGI to an unregulated affiliate, MFG Special Investor, LLC ("**Special**

**Investor**") in order to relieve some of the capital pressure experienced by MFGI, and to provide

a loan to MFGI for its general liquidity needs.

153.    For at least a year prior to the Company's collapse and the Debtors' bankruptcy,

the FCM provided cash through intraday transfers to the B/D, often in amounts of between $50

and $100 million.  At times between July and October 2011, these intraday transfers were not

paid back at the end of the day, causing the B/D's loan from the FCM to roll over on a routine

basis.

154.    Due to its lack of controls, the Company was unable to identify the specific areas

or trades that were driving the need for these intraday transfers, and so the Treasury Department

had to approve intraday transfer requests from the B/D without adequate information.  The lack

of systems also limited the Company's ability to project its funding needs.  The Company had no

formal process or documentation in place for approval of transfers from the FCM to the B/D.

155.    On or about July 2011, at Defendant Corzine's request, Defendant Steenkamp

began to seek more sources of funds – including loans from the FCM – to finance the B/D's

trading.  At the time, the FCM's excess funds had eroded from approximately $150 million to

$75 million.  During a telephone conference in late July 2011, which included Serwinski, the

CFO of MFGI, among its participants, Defendant Steenkamp indicated that there was a proposal

to utilize unused segregated funds to support the B/D.

156.    When Defendant Steenkamp suggested to Serwinski that the Company was

considering using segregated funds of FCM customers, Serwinski stated her concerns that using

segregated funds for investments would be putting the FCM client assets at risk, "even if only

overnight," and emphasized that the FCM client asset base "should not be a [B/D] working

capital source strategy to be relied upon."  Serwinski made it clear to Defendant Steenkamp that

she "professionally [did] not agree with the concept of using FCM customer funds to provide liquidity to the House [B/D] investment and trading."

157.    Notwithstanding Serwinski's concerns, Defendant Corzine continued to probe how much of the FCM's funds could be used by the B/D on a short-term basis to satisfy the Company's liquidity needs.  Steenkamp reported on or about August 3, 2011, that, even though Corzine understood the regulatory lock-up requirement:

> as part of overall liquidity management, [Corzine] would like to know how we can use all surplus daily (even if only $50m), maximize it through daily liquidity management and also use other securities to fund the lock-up.  He also understands using other securities would have a cost, but is looking for this group to come to him with solutions/options, and also accompanying costs.

158.    Defendants Corzine and Steenkamp continued to promote the potential use of customer funds to meet the Company's growing liquidity pressures in the summer of 2011. Notwithstanding the Company's statutory obligation to segregate customer funds, Defendant Corzine nonetheless directed the Finance and Treasury Departments, through Defendant Steenkamp, to "maximize" the use of any daily surplus of customer segregated funds.

159.    An August 10, 2011 email written by Assistant Treasurer O'Brien indicated that Defendant Steenkamp failed to acknowledge the precarious liquidity position of the Company: "Henri [Steenkamp] says to me today '. . . we have plenty of cash.'  I was rendered speechless – and wanted to say 'Really, then why is it I need to spend hours every day shuffling cash and loans from entity to entity?'  Shell game . . . ."

160.    In September 2011, Defendant Steenkamp again showed his willingness to rely upon segregated customer funds, this time to project a healthy image of the Company's financial condition.  On August 18, 2011, Defendant Abelow had provided liquidity figures to the United Kingdom's Financial Services Authority ("**FSA**") showing that the Company had cash available

of $410 million, and that MFGI had available cash of $165 million. When the FSA requested

updated liquidity numbers in mid-September, Treasury Department employees discovered that,

in less than a month, the Company's available cash had dropped from $410 million to $238

million, and MFGI's available cash had dropped from $165 million to $25 million.

161.    When the Company provided the updated liquidity figures to the FSA,

Defendant Steenkamp approved the inclusion of an additional $300 million from the FCM

segregated fund liquidity pool.    Despite the fact that segregated funds had not been included in

the August report, the Company represented that the September report was "in the same format."

162.    To ease the capital and liquidity pressures experienced by the Company over the

summer of 2011 both before and after the imposition of FINRA's net capital charge, Defendants

Abelow and Steenkamp initiated several actions to decrease regulatory capital requirements,

including:  (a) the transfer of most of PSG's positions to Special Investor; (b) the transfer of

some Euro RTM positions from MFGI to FinCo; and (c) the sale of the Company's London and

Asia Pacific affiliate clearing business to the Bank of New York ("**BONY**").  Defendant Abelow

was responsible for accelerating the sale of the affiliate business to BONY.

163.    Defendants failed to inform the Board about the B/D's reliance on FCM funds,

the B/D's actual growing use of those funds through intraday loans from the FCM, and the

increased liquidity pressure that generated the need for these transfers through the summer of

2011.

### iii.    Defendants Failed to Engage in Timely Contingency Planning

164.    Despite months of warnings and reports of liquidity stresses from several

departments, Defendants waited until August and September 2011 to conduct contingency

planning.

165.    In or around August 2011, several Board members directed Defendants to prepare
an analysis of the potential impact of a downgrade of the Company's credit rating under various
scenarios.  This analysis ultimately was dubbed "Break the Glass."  Defendants directed,
reviewed, edited, and ultimately approved the "Break the Glass" analysis for distribution to the
Board.  The analysis specifically identified the Euro RTMs as the largest liquidity drain for the
Company and observed that liquidity could only be generated through taking a large loss from
unwinding Euro RTM positions.  The analysis also stated that the Company needed to act
immediately and develop a clear strategy for mitigating the stresses associated with the Euro
RTM portfolio.

166.    The Break the Glass analysis projected that the Company would survive, even in
the most "severe stress event."  This erroneous conclusion underestimated the speed and extent
of the demands that were placed on the Company as a result of the credit rating agency
downgrades, including the pace and size of customer withdrawals, the failure of the Company's
operations to function normally in such a stressed environment, and the ensuing margin increase
demands by the clearinghouses.  Although the analysis had anticipated that the Company had
sufficient liquidity to survive at least one month, the worst-case scenario unfolded in the span of
only a few days.

167.    During the process of drafting the Break the Glass analysis, Defendant Abelow
expressed doubt about its overly optimistic conclusions.  In an October 10, 2011 email to
Defendant Steenkamp, Defendant Abelow observed:

> **I [do not] have any real confidence at this point that we know
> our liquidity in each of days 1-7 in event of a stress event.** This
> is troubling as we need to provide an answer to [the] board and
> [Corzine] and I need to know so that we can assess if there are
> steps we need to take over [the] next several weeks.

47

(Emphasis added.)

168.     In response to Defendant Abelow's email, Defendant Steenkamp shared

Defendant Abelow's concern: "I felt the same way in reading through this, Brad. It felt like a

good story at each milestone (day 0, day 7, day 30), but that assumes we get there."

169.     Despite their concerns about the Company's ability to forecast its liquidity,

neither Defendant Abelow nor Defendant Steenkamp took steps to address the issue.

170.     On or about October 5, 2011, Defendant Corzine directed the Company's Global

Treasurer, Vinay Mahajan ("**Mahajan**"), who had just joined the Company in mid-August, to

engage in liquidity contingency planning. Specifically, Corzine asked Mahajan to:

   a.   Locate funding for the Company's corporate portfolio in the event that the
        secured financing desk was unable to finance those investments through
        repurchase transactions;

   b.   Identify positions in the box which could be sold to generate liquidity; and

   c.   Build a global liquidity buffer by preparing for a draw on the RCF to support
        the Company's corporate portfolio.

171.     On or about October 6, 2011, Mahajan informed Defendants Abelow and

Steenkamp of the following major increased stresses to the Company's liquidity:

   a.   A $30 million increase in the Company's box position;

   b.   $82 million in haircuts associated with the fixed income business;

   c.   Breaches of regulatory capital limits by the fixed income and the asset-backed
        securities trading desks; and

   d.   A liquidity drain caused by corporate and asset-backed and mortgage-backed
        securities positions.

Mahajan reported that the sole remaining cash pool was $80 million used by the FCM to finance

client activity.

172.    Defendant Steenkamp outlined the Company's liquidity problems in an October

6, 2011 email to Defendants Corzine, Abelow and others:

> There remains a significant stress on liquidity . . . . Of most concern, is the sustained levels of stress and the lack of signs this will reduce soon. It makes drawdowns of the [RCF] more challenging, as we cannot guarantee certainty of immediate repayment. The [RCF] is not meant as a source of permanent liquidity.
>
> TODAY, TOMORROW −
>
> Haircuts and box positions today have continued to increase and were fortunately offset by FCM increases (that is not controllable). However, liquidity remains under $100m with the expectation for this to drop tomorrow as repo sources (rebalancing) are reduced. . . .
>
> THE FUTURE −
>
> However, Jon, more worrying is we need to address the sustained stress. In summary, we have three pools of liquidity for [MFGI]- (1) [FinCo] cash which is real and permanent, (2) FCM excess cash which is temporary and volatile, as depends on how customers post margin, and (3) the situation of our broker-dealer that is currently unable to fund itself, and more worrying continues to need more cash than we have in [FinCo], thereby having us dip into FCM excess every day. This should be temporary but is becoming permanent, and the FCM cash is not reliable. Why is [the B/D] unable to fund itself? Part of it is the permanent pool of liquidity needed for RTM's, but we also see continued haircut increases in fixed income, increased funding needed for PSG and box size being permanently large. . . . [T]his continued liquidity stress is not sustainable without either more permanent (not temp) liquidity, or mitigating steps taken.

173.    This email highlighted liquidity problems that MF Global was facing, including:

a.    The inability to rely on the RCF as a source of liquidity;

b.    Increased funding needed for PSG and the growing size of the box;

c.    The temporary and volatile nature of FCM cash that made it an inappropriate source of sustained funding;

49

d.  Shrinking cash available for liquidity funding; and

e.  The inability of the B/D to fund itself.

174.  Defendants also were aware of the following "red flags" that highlighted the precarious financial situation of the Company:

a.  On October 11, 2011, Abelow and Steenkamp learned that the B/D was using up $210 million of FinCo's $226 million liquidity pool;

b.  On October 13, 2011, Abelow and Steenkamp further learned that FinCo's $233 million balance had been completely used up by the B/D, which was already borrowing $34 million from the FCM;

c.  By October 14, 2011, Abelow and Steenkamp learned that the B/D was using $318 million from a combination of FinCo ($249 million), the FCM balance ($53 million), and the FCM buffer ($16 million), which consisted of funds held by the Company in customer accounts in excess of certain regulatory requirements;

d.  On October 14, 2011, Steenkamp described the Company's liquidity to Defendant Corzine as "very tight;" and

e.  On October 17, 2011, Steenkamp informed Corzine and Abelow that, instead of ending the day with positive amounts of cash, the Company had actually ended the day with negative $16 million.  Due to a regulatory lock-up requirement that MFGI lock up $19 million to meet potential customer demands, the Company would have a negative $35 million start the following day.

175.  An October 17, 2011 analysis of the key drains on the Company's liquidity between June 30 and October 14, which was provided to Defendants, indicated that, in less than four months, the margin requirements associated with the Euro RTM positions had increased from $248 to $427 million, while the box collateral had gone from zero to $126 million.  The Company experienced further liquidity stresses from the additional haircuts paid to finance its portfolio of corporate bonds.

50

### E.  Events Immediately Preceding the Chapter 11 Cases

176.    As of October 17, 2011, MF Global's liquidity was severely depleted.  Since the end of June 2011, the Company went from having excess cash and fully paid securities of $149 million to needing $318 million in cash.  That increased funding need was due in part to the aforementioned increase in Euro RTM margin calls and in part to the funding needed to finance the securities in the box, a funding requirement that had not existed on June 30, 2011.

177.    An October 17, 2011 article in The Wall Street Journal entitled "MF Global Told to Boost Capital" reported FINRA's regulatory capital charge as follows:  "Regulators ordered MF Global Holdings Ltd., the brokerage firm led by former New Jersey Gov. Jon Corzine, to boost its net capital in August after they grew concerned about its exposure to European debt." The credit rating agencies downgraded the Company's credit ratings within a week of The Wall Street Journal article.

178.    On October 24, 2011, Moody's Investors Service ("**Moody's**") downgraded MF Global to one notch above "junk" status, with a negative watch rating, strongly suggesting that Moody's was planning on a further downgrade.  Moody's rating downgrade was based on its belief that (a) the Company would announce lower than expected earnings; and (b) the current low interest rate environment and volatile capital markets made it unlikely that MF Global would be able to meet, in the short term, the financial targets that Moody's had set in February 2011 for the Company to maintain a Baa2 rating.  These targets included generating $200 to $300 million in annual pre-tax earnings and maintaining the liquidity and risk management discipline necessary as the Company executed its B/D strategy.

179.    Moody's stated that it had become increasingly concerned about MF Global's risk management and its management's ability to prudently balance risk and reward as the Company

underwent a substantial re-engineering.  Moody's also stated that: "MF Global's increased

exposure to European sovereign debt in peripheral countries and its need to inject capital into its

[B/D] subsidiary to rectify a regulatory capital shortfall highlights the [Company's] increased

risk appetite and raises questions about the [Company's] risk governance."

180.    On October 25, 2011, the Company announced its results for its second fiscal

quarter ended September 30, 2011, posting a $191.6 million GAAP net loss, compared with a

loss of $94.3 million for the same period the prior year.  The net loss reflected, among other

things, a decrease in net revenue primarily due to the contraction of proprietary principal

activities and valuation allowances against deferred tax assets, which accounted for $119.4

million of the $191.6 million in GAAP net loss.  The deferred tax asset write-off reflected the

view of management that the Company would not be profitable in the near future.  The

Company's stock price fell that day by almost 50%.

181.    Despite the liquidity warning signs discussed above, on October 24, 2011,

Defendant Steenkamp wrote an email to Standard & Poor's Rating Services ("**S&P**") stating, MF

Global's "capital and liquidity has never been stronger," and "MF Global is in its strongest

position ever as [a] public entity."   During an October 25, 2011 earnings call, Defendants

Corzine and Steenkamp continued to highlight what they claimed was the Company's

strengthened liquidity and capital profile.  Defendant Corzine represented that management had

"substantially improved our capital and liquidity positions" and "husbanded our capital and

strengthened our liquidity."  Defendant Steenkamp also stated that "the capital market

transactions this quarter improved [the Company's] capital and liquidity positions," its "capital

structure has never been stronger," and that management felt "good about [the Company's]

capital structure and liquidity position as well as the strategic direction and progress against the plan."

182.    On October 26, 2011, Fitch Ratings ("**Fitch**") downgraded the Company's stock to one notch above investment grade.

183.    Also on October 26, 2011, S&P placed the Company under Negative Credit Watch with Negative Implications, taking note of the Company's "very high" exposure to European sovereign debt in relation to its capital base.

184.    Fitch and Moody's further downgraded the Company to "junk" status on October 27, 2011, because of its weakened core profitability and increased risk-taking, in the form of its Euro RTM positions.  This was followed by an increase in margin calls against MFGI and an exodus of its customers, threatening overall liquidity.

185.    During the last week prior to the bankruptcy filings of Holdings Ltd. and FinCo, the Company's goal was to sell all the positions in the Company's portfolio to ensure that it had enough cash to make all of its required payments.  The Company engaged in a "fire sale" by sending bid lists to other Companies showing the securities that the Company was willing to sell. However, the Company's Operations and Treasury Department systems were inadequate to meet the challenge of a speedy liquidation of the Company's assets in this short period of time. Among other reasons, the liquidation could not be accomplished due to substandard back office systems which generated inaccurate or erroneous fail reports, the lack of a collateral management database, and the lack of an integrated global treasury system to track whether money was properly moving to the right accounts.  The Company's failure to have back office and treasury systems commensurate with the complexity of its operations exacerbated the Company's

problems and prevented it from selling sufficient assets to pay the Company's debts as they came due.

186.    The Company also failed to take advantage of opportunities to mitigate its losses. For example, on October 26, 2011, Abelow met with a representative from another B/D who offered to consider purchasing MF Global's portfolio of Euro RTMs.  When Abelow attempted to arrange a meeting between the representative and Corzine to discuss a possible transaction, Corzine refused to meet with him because he was in the process of auctioning some commercial paper, and needed to do it before the close of the London market.  Consequently, no sale of the Euro RTMs was discussed with that B/D at this time, and the Company missed an opportunity to sell its Euro RTM portfolio.

187.    During the last week prior to the bankruptcy filings of Holdings Ltd. and FinCo, margin requirements on the Euro RTM positions increased dramatically and further stressed the Company's liquidity.  Euro RTM margin posted at the clearinghouses increased by $211 million to $663 million.  On October 25, 2011, MFG UK received a margin call from the LCH for 110% margin based on the Company's downgrade by Moody's of the Company's issuer credit rating to Baa3, which took effect on October 27, 2011.  The accelerated pace of the Euro RTM-related margin calls coupled with other liquidity pressures experienced by the Company ultimately caused MFGI to fail to meet the last $310 million in margin calls received on October 31, 2011.

188.    In an attempt to alleviate its liquidity pressures, on five separate instances between October 18 and 28, 2011the Company drew a total of $930 million on its $1.2 billion RCF.  By October 27, the facility was almost fully drawn, with the exception of $27 million that one of the syndicate banks refused to fund.

189.    On October 26, 2011, to satisfy the need for additional liquidity at the B/D, MFGI transferred $615 million from the FCM.  Most, if not all, of those funds came from customer funds, and none of those funds were returned to the FCM that day.  Even well after the end of that business day, members of the Treasury Department did not know whether the funds transferred actually came from customer funds, due to the Company's inability to monitor segregated funds in real time.  In fact, on that day, the FCM had negative customer segregated funds.

190.    Treasury Department personnel also withdrew an additional $200 million from segregated customer funds on October 28, 2011.  MFG UK had a $175 million obligation to JPMorgan Chase ("**JPM**") resulting from several overdrafts, and Defendant Corzine directed the Treasury Department to satisfy this obligation.  O'Brien arranged a $200 million wire transfer from an MFGI customer segregated account to a Company house account, and then transferred $175 million of that amount to an MFG UK account at JPM.

191.    At the time O'Brien transferred the $200 million from segregated funds, it was unclear whether that amount was available in excess customer funds.  When JPM sought assurances that the money transferred from MFGI did not represent customer funds, O'Brien was unable to provide that assurance, at least in part because the Company's internal reports were inadequate to monitor the Company's liquidity and customer segregated funds accurately and in real time.  Treasury Department personnel subsequently learned that, as of the close of business on October 27, 2011, the Company's segregated accounts had a deficiency of over $300 million.

192.    When Financial Regulatory Group staff attempted to reconcile the deficiency, they determined that the deficiency was the result of five transactions totaling $540 million that had been booked incorrectly.  To make matters worse, these Financial Regulatory Group staff

members, on their own authority, manually adjusted the Company's segregation statement by $540 million in the absence of back-up for that adjustment, and thus reported an excess $200 million in segregation on reports filed with the regulators. On the following day, when a member of the Financial Regulatory Group prepared the Segregation Statement and Secured Statement, he discovered a deficit of almost $1 billion.

193.    Early in the morning of October 31, 2011, MFGI reported a $952 million deficit in segregated funds as of the close of business on October 28. Initially, Finance and Treasury personnel erroneously believed that the deficit was due to an accounting error. A subsequent review by the Trustee in MFGI's SIPA liquidation determined that MFGI had a deficiency in its segregated funds as early as mid-day on October 26, 2011.

194.    The Company explored a number of strategic alternatives, including a sale of all or parts of the business, before the Debtors went bankrupt. On October 30, 2011, with the Company's overall liquidity quickly diminishing to unsustainable levels, a sale to a third party collapsed when the Company informed the would-be buyer that it had identified a potential significant shortfall in customer segregated funds.

## COUNT I

### BREACH OF FIDUCIARY DUTY OF CARE
### BY DEFENDANTS CORZINE, ABELOW AND STEENKAMP

195.    Plaintiff repeats and realleges each and every allegation above, as if fully set forth herein.

196.    By virtue of Defendants' positions with MF Global, a fiduciary relationship existed between Defendants and the Company.

197.    As fiduciaries, Defendants were obligated by their duty of care to act at all times on an informed basis, using the amount of care that a reasonable person in Defendants' positions

56

would use under similar circumstances. Defendants also were obligated to act rationally and

with the highest degree of good faith.

198. Defendants breached their fiduciary duty of care when they, among other things:

    a.  Embarked on a transformation of the Company's business, including entering
into the Euro RTM trades and proprietary trades, without taking steps to
ensure that the Company's controls and procedures were adequate to, among
other things, monitor and determine its liquidity in real time, to forecast its
liquidity, and to track intra-company transfers of funds;

    b.  Failed to fully inform themselves of all material information reasonably
available to them as to the state of the Company's systems and liquidity, prior
to making the consequential business decision of transforming the Company's
business model from that of a commodities broker to that of a B/D and
investment bank and increasingly engaging in proprietary trading, all of which
put the Company's balance sheet at risk;

    c.  Failed to fully inform themselves of all material information reasonably
available to them, and to act with requisite care in the discharge of their
duties, in their pursuit of a short-term revenue strategy consisting of
transacting in Euro RTMs;

    d.  Engaged in the Euro RTM strategy without a reasonable inquiry as to the
liquidity risks posed by these investments;

    e.  Failed to adequately consider the advice and warnings of the Company's
CROs in connection with the risks posed by the Euro RTM strategy; and

    f.  Failed to inform the Board about the Company's liquidity challenges and the
deficiencies in its systems and controls.

199. In committing the breaches set forth above, Defendants were grossly negligent in

the performance of their duties.

200. Defendants' acts and omissions were not a rational and/or good faith exercise of

prudent business judgment to protect and promote the Company's interests.

201. As a result of the conduct alleged herein, Defendants are liable to the Debtors and

the Company.

202.    As a direct and proximate result of Defendants' breaches of their fiduciary duty of

care, the Company collapsed, the Debtors commenced bankruptcy proceedings, and the Debtors

and the Company sustained significant damages in an amount to be ascertained.

### COUNT II

### BREACH OF FIDUCIARY DUTY OF LOYALTY
### BY DEFENDANTS CORZINE, ABELOW AND STEENKAMP

203.    Plaintiff repeats and realleges each and every allegation above, as if fully set forth

herein.

204.    By virtue of Defendants' positions as officers of MF Global, a fiduciary

relationship existed between Defendants and the Company.

205.    As fiduciaries, Defendants were obligated by their duty of loyalty to the Company

to act in a manner consistent with the best interests of the Company.

206.    Defendants breached their fiduciary duty of loyalty to the Company by repeatedly

failing to act in the face of a known duty to act, demonstrating a conscious disregard for their

duties as officers of the Company.  Among other things, Defendants failed to develop the

appropriate controls, procedures and systems needed to transform the Company's business into a

full-scale investment bank pursuant to Defendant Corzine's strategy; and committed the

Company to proprietary and Euro RTM trading without ensuring that the Company had

sufficient controls and adequate liquidity to properly manage the risks inherent in such trading.

207.    Defendants' acts and omissions were not a rational and/or good faith exercise of

prudent business judgment to protect and promote the Company's interests.

208.    As a result of the conduct alleged herein, Defendants are liable to the Debtors and

the Company.

209.    As a direct and proximate result of Defendants' failures to satisfy their fiduciary duty of loyalty, the Company collapsed, the Debtors commenced bankruptcy proceedings, and the Debtors and the Company sustained significant damages in an amount to be ascertained.

## COUNT III

## BREACH OF FIDUCIARY DUTY OF OVERSIGHT BY DEFENDANTS CORZINE, ABELOW AND STEENKAMP

210.    Plaintiff repeats and realleges each and every allegation above, as if fully set forth herein.

211.    By virtue of Defendants' positions with MF Global, a fiduciary relationship existed between Defendants and the Company.

212.    As fiduciaries, Defendants owed the Company a duty to monitor and exercise oversight, and to act in good faith and in the best interests of the Company.

213.    Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls, and financial affairs of the Company.  Upon receiving notice or information of imprudent or unsound practices, Defendants were required to make a reasonable investigation and to correct those practices.  Defendants also were required to conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to maximize the profitability of the Company and to assure that business risks taken were reasonable in relation to, among other things, the potential profit the transactions offered.

214.    Defendants breached their fiduciary duty of oversight by the acts and omissions set forth herein, including, but not limited to:

   a.   Defendants' failures to implement a system to accurately track the Company's available liquidity and other customary reporting and information systems or controls to monitor the business;

b. Defendants' failures to properly monitor the risks associated with the Company's proprietary trading strategy and investment in Euro RTMs;

c. Defendants' failures to monitor and oversee the Company's operations by failing to correct the Company's deficient systems, despite numerous reports flagging their deficiencies;

d. Defendants' failures to heed the CRO's warnings about the worsening market conditions in Europe and the Company's increased liquidity exposure stemming therefrom; and

e. Defendants' failures to inform the Board about the Company's liquidity challenges and the deficiencies in its systems and controls.

215. Defendants' acts and omissions were not a rational and/or good faith exercise of prudent business judgment to protect and promote the Company's interests.

216. As a result of the conduct alleged herein, Defendants are liable to the Debtors and the Company.

217. As a direct and proximate result of Defendants' failures to satisfy their fiduciary duty to monitor the Company's affairs, the Company collapsed, the Debtors commenced bankruptcy proceedings, and the Debtors and the Company sustained significant damages in an amount to be ascertained.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff prays for judgment:

1. Awarding Plaintiff damages in an amount to be determined at trial;

2. Awarding Plaintiff its attorney's fees, costs, and other expenses incurred in this action; and

      3.      Granting Plaintiff such other and further relief as the Court deems appropriate.

New York, New York
Dated:  April 22, 2013                Respectfully Submitted,
                                MORRISON & FOERSTER LLP

                                By: /s/ Adam S. Hoffinger
                                Adam S. Hoffinger
                                Daniel A. Nathan
                                2000 Pennsylvania Ave., NW
                                Washington, DC 20006-1888
                                Tel.:  (202) 887-1500
                                Fax:  (202) 887-0763
                                ahoffinger@mofo.com
                                dnathan@mofo.com

                                Brett H. Miller
                                1290 Avenue of the Americas
                                New York, NY 10140-0050
                                Tel.:  (212) 468-8000
                                Fax:  (212) 468-7900
                                bmiller@mofo.com

                                *Attorneys for the Chapter 11 Trustee, Louis J. Freeh*