UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>MF GLOBAL HOLDINGS, LTD, *et al.,*<br><br>Debtors. | **NOT FOR PUBLICATION**<br><br>Chapter 11<br><br>Case No. 11-15059 (MG)<br><br>Jointly Administered |

**MEMORANDUM OPINION AND ORDER SUSTAINING OBJECTIONS TO CLAIMS
FILED BY DANIEL BRERETON**

*A P P E A R A N C E S:*

LIDDLE & ROBINSON, L.L.P.
*Attorneys for Daniel Brereton*
1835 Market Street, Suite 1400
Philadelphia, PA 19103
By:    Sherry M. Shore, Esq.

MORRISON & FOERSTER LLP
*Counsel for MF Global Holdings Ltd., as Plan Administrator*
250 West 55th Street
New York, New York 10019
By:    Craig A. Damast, Esq.

**MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE**

Daniel Brereton worked for non-Debtor MF Global Inc. ("MFGI") from June 2011 until

he was terminated on or about November 11, 2011.  Before beginning at MFGI, he entered into

an employment agreement entitling him to a fixed salary, two sign-on bonuses, and other

benefits.  One of his bonuses would be paid in the form of restricted share units ("RSUs")

awarded by Debtor MF Global Holdings Ltd. ("MFGH").  The Debtors[1] filed for bankruptcy

before Brereton received his second sign-on bonus (the "Second Bonus").  Brereton filed two

proofs of claim:  (1) Claim 1363, alleging entitlement to unpaid salary, the Second Bonus, a

---

[1]    The Debtors in these chapter 11 cases are MFGH, MF Global Finance USA Inc., MF Global Capital LLC,
MF Global Market Services LLC, MF Global FX Clear LLC, and MF Global Holdings USA Inc.

guaranteed incentive award, and employee expenses; and (2) Claim 1359, limited to the Second

Bonus.  Brereton has since abandoned all claims against the Debtors except the claim regarding

the Second Bonus (the "Second Bonus Claim"), and the Court expunged the portion of Claim

1363 seeking all other relief.  Thus, both Claims 1363 and 1359 assert liability based only on the

Second Bonus.

The Plan Administrator objects to both claims, arguing that Brereton's Second Bonus

Claim is actually not a claim at all.  Rather, according to the Plan Administrator, the Second

Bonus Claim is an interest based on equity securities that does not entitle Brereton to assert a

claim under the Bankruptcy Code as a creditor; and, to the extent it represents a viable claim, the

Second Bonus Claim should be subordinated under Bankruptcy Code section 510(b) because the

bonus was payable in RSUs, which are securities.  Brereton argues in opposition that RSUs are

(1) not equity securities, so he is asserting a cognizable claim under the Bankruptcy Code, and

(2) not securities subject to subordination.  Brereton's arguments are unavailing.

The Court finds that Brereton's Second Bonus Claim asserts an equity interest, not a

claim that is recoverable through the claims allowance process.  Alternatively, even if it

constitutes a recoverable claim, the Second Bonus Claim should be subordinated.  Functionally,

the alternative holdings lead to the same result:  Brereton will not recover on the Second Bonus

Claim because even if the claim is allowed as subordinated, subordination will put Brereton in a

class of claimants who will not receive distributions under the Debtors' Second Amended and

Restated Plan (the "Plan").  The Plan Administrator's objections to Brereton's Claims are

therefore **SUSTAINED**.  Claim 1363 has already been disallowed and expunged, except for the

portion relating to the Second Bonus.  That portion of Claim 1363 and the entirety of Claim 1359

are hereby subordinated and reclassified as Class 9A Common Interests under the Debtors' Plan.

2

## I.    BACKGROUND

### A.    Procedural History

Pending before the Court are two objections:  the Plan Administrator's Forty-Seventh

Omnibus Objection (the "Forty-Seventh Objection," ECF Doc. # 1836) and Forty-Eighth

Omnibus Objections (the "Forty-Eighth Objection," ECF Doc. # 1844, and together with the

Forty-Seventh Objection, the "Objections").  In support of the Objections, the Plan

Administrator filed Declarations of Scott A. Rinaldi (ECF Doc. ## 1836-3, 1844-3), describing

the Plan Administrator's professionals' review of the claims.  This Opinion relates solely to

Claim 1363, subject to the Forty-Seventh Objection, and Claim 1359, subject to the Forty-Eighth

Objection.  Both Claims were filed by Daniel Brereton, who filed an opposition to both

Objections (the "Forty-Seventh Opp." ECF Doc. # 1878, and the "Forty-Eighth Opp." ECF Doc.

# 1879).  The Plan Administrator filed a joint reply addressing both Oppositions (the "Joint

Reply," ECF Doc. # 1942).  On July 17, 2014, the Court held a hearing (the "Hearing")

regarding the Objections and took the matter under submission.

MFGH filed its voluntary petition for chapter 11 relief on October 31, 2011.  During

October and December 2011, certain other MF Global entities filed voluntary chapter 11

petitions, joined by MF Global Holdings USA ("Holdings USA") in March 2012.   On June 28,

2012, the Court entered an order setting August 22, 2012 as the Bar Date for general creditors.

(ECF Doc. # 740.)

On November 13, 2012, the Court entered the *Order Pursuant to Section 105(a) of the*

*Bankruptcy Code and Bankruptcy Rules 3007 and 9019(b) for Approval of Claims Objection*

*Procedures and Settlement Procedures* (the "Claims Objection and Settlement Procedures

Order," ECF Doc. # 906).  Pursuant to the Claims Objection and Settlement Procedures Order,

the Trustee may file up to 200 objections to Claims per omnibus objection subject to certain

limitations regarding the basis for the objections.

On February 15, 2013, the Court entered the *Order Pursuant to Sections 105 and 503 of*

*the Bankruptcy Code and Bankruptcy Rules 2002 and 9007 (I) Setting Bar Date for Filing*

*Proofs of Claim Asserting Administrative Claims and (II) Approving Form and Manner of Notice*

*Thereof.* (ECF Doc. # 1091.)  On April 1, 2013, the Trustee and the Creditor Co-Proponents

filed the *Amended and Restated Joint Plan of Liquidation Pursuant to Chapter 11 of the*

*Bankruptcy Code for MF Global Holdings Ltd., MF Global Finance USA Inc., MF Global*

*Capital LLC, MF Global FX Clear LLC, MF Global Market Services LLC, and MF Global*

*Holdings USA Inc.* (the "Original Plan," ECF Doc. # 1267).  On April 5, 2013, the Court entered

an order confirming the Original Plan.  (ECF Doc. # 1288.)  On May 2, 2013, the Court entered

an order permitting the Plan Proponents to make nonmaterial modifications to the Plan.  (ECF

Doc. # 1376.)  The Plan Proponents filed the Second Amended and Restated Plan on May 3,

2013 (ECF Doc. # 1382), and that Plan went effective on June 4, 2013.

**B.    Brereton's Employment**

On June 8, 2011, Brereton executed an employment agreement (the "Employment

Agreement," ECF Doc. # 1879-1) with Debtor MF Global Holdings USA, Inc. ("Holdings

USA").  Although the letter stated that Brereton would be an employee of Holdings USA, he was

actually an employee of MFGI, the debtor in a separate SIPA proceeding pending in this Court

(Case No. 11-02790).  (*See* ECF Doc. # 1363-3 (Rinaldi Declaration stating that all claimants

subject to the Forty-Seventh Objection were employees of MFGI); *see also* ECF Doc. # 1840

(Statement of MFGI's SIPA Trustee verifying that claimants subject to Forty-Seventh Objection

were employees of MFGI).)  Brereton does not contest this point.  Brereton began working for

MFGI on June 20, 2011.  (*See* Employment Agreement at 1.)

The Employment Agreement describes Brereton's incentive package and employment

terms.  Relevant to this Opinion, the Agreement establishes that Brereton was to receive:  (1) a

base salary of $250,000; (2) a first sign-on bonus of $200,000, payable in cash; (3) the Second

Bonus of $500,000, payable in RSUs, or in cash at the Debtors' discretion; and (4) a guaranteed

incentive award of $250,000.  (Employment Agreement at 1–2.)  The RSUs would be awarded

pursuant to MFGH's Long Term Incentive Plan (the "RSU Award Agreement," ECF Doc.

# 1879-2).  Brereton served as Senior Vice President and Co-Head of Credit Trading of MFGI

until he was terminated on or about November 11, 2011.  (Forty-Seventh Opp. ¶¶ 2, 5.)

### C.   The RSU Award Agreement

The dispute about Brereton's Claims hinges on the RSU Award Agreement that governed

payment of Brereton's Second Bonus.  The Agreement describes the RSUs as "an unfunded

unsecured promise by [MFGH] to deliver, by issue, to the Grantee . . . one Share [of MFGH

common stock] on the respective Delivery Date(s) as provided in this Agreement . . . ."  (RSU

Award Agreement ¶ 2.)  RSUs were scheduled to vest in thirds over the course of three years.

(*See id.* ¶ 3.)  The Agreement also states that "in the discretion of the [Compensation]

Committee, in lieu of all or any portion of the RSU Shares otherwise deliverable . . . the

Company may deliver cash . . . ."  (*Id.* ¶ 4(b).)  After vesting, the Grantee would have the rights

of an MFGH shareholder.  (*See id.* ¶ 12.)

The RSU Award Agreement also provides that in the event of termination, Brereton's

unvested RSUs would be forfeited unless he was terminated (1) by mutual consent, (2) without

5

cause, or (3) for a reason covered by Brereton's Employment Agreement. (*See id.* ¶ 5.) The

Remaining terms of the RSU Award Agreement are not relevant to the current dispute.

### D.    The Brereton Claims

When he filed Claim 1363, Brereton initially sought (1) $145,833.24 in base salary for

November 30, 2011 through June 15, 2012; (2) the Second Bonus of $500,000; (3) his

guaranteed incentive award of $250,000; and (4) $4,000 in unreimbursed employee expenses. In

total, Claim 1363 asserted an $899,833.24 claim, $11,725 of which Brereton asserted as a

priority claim, with the remaining portion asserted as unsecured. Brereton has since abandoned

all claims except for the Second Bonus Claim, and the Court expunged the remainder of Claim

1363 at the Hearing. Thus, Claim 1363 now represents a $500,000 claim based only on the

Second Bonus. Claim 1359 relates solely to the Second Bonus Claim and has not been modified

since filing.

### E.    Brereton's SIPA Claim

Brereton also filed a claim in the MFGI SIPA proceeding. He asserted a $399,000 claim,

which was allowed as modified pursuant to this Court's order reducing the claim amount to

$254,000. (*See* Case No. 11-02790, ECF Doc. # 8016.)

### F.    The Objections

Because Brereton has abandoned a portion of Claim 1363, the only relevant portions of

the Objections request an order subordinating and reclassifying Claims 1363 and 1359 as Class

9A Common Interests under the Second Amended and Restated Plan. The Plan Administrator

argues that the Second Bonus Claim is actually an equity interest, not a claim that a creditor is

entitled to assert; and that, to the extent the Second Bonus Claim is a claim, it should be

subordinated under Bankruptcy Code section 510(b). (*See* Forty-Seventh Objection ¶ 22.)

### G.    Brereton's Oppositions

Brereton argues that the Plan Administrator is wrong to describe the Second Bonus Claim
as an interest subject to subordination.  (Forty-Seventh Opp. ¶ 7.)  If Brereton's Second Bonus
Claim is subordinated, he will receive nothing.  (*Id.* ¶ 8.)  Brereton argues that grants of RSUs do
not constitute equity interests because 11 U.S.C. § 101(16) excludes from its definition of
"equity securities" convertible rights to buy shares, and the RSUs here were convertible.  (*Id.* ¶
9.)  He also argues that the RSUs do not meet the Code's definition of a "security" under 11
U.S.C. § 101(49)(A) because that section lists a host of examples of securities but does not
include anything comparable to RSUs.  (*Id.* ¶ 10.)  Thus, Brereton argues that he has a valid
claim, not an equity interest, and the claim should not be subordinated.

Next, Brereton distinguishes the cases that the Plan Administrator cites in the Objections
because those cases do not discuss instruments like RSUs.  (*Id.* ¶ 11.)  One of the cases, *In re
Enron Corp.*, 341 B.R. 141 (Bankr. S.D.N.Y. 2006), only addressed vested stock options as
opposed to a fixed contractual compensation amount to be paid when the RSUs vest.  (Forty-
Seventh Opp. ¶ 11.)  The *Enron* court actually left open the issue whether certain stock options
could be designed to avoid subordination.  *See Enron*, 341 B.R. at 144 n.3.  Brereton then
contrasts the function of typical stock options with the RSUs here—ordinarily, stock options just
allow employees to participate in their employers' successes, but the RSUs were structured to
pressure Brereton to stay employed with MF Global so he could receive what he was already
owed.  (Forty-Seventh Opp. ¶ 12.)  Additionally, he argues, the fact that MFGH made the bonus
payable in RSUs *or* cash shows that this was not an equity interest.  (*Id.* ¶ 13.)

In the 48th Opposition, Brereton repeats many of the same arguments.  He omits
discussion of all compensation other than the Second Bonus.  (*See* Forty-Eighth Opp. ¶¶ 3–7.)

He again asserts that the Second Bonus Claim is not an equity interest and that RSUs are not securities. (*See id.* ¶¶ 9–10.)

### H.    The Joint Reply

The Plan Administrator argues in the Joint Reply that the RSUs represented a contingent right to receive MFGH shares upon vesting, not a contingent right to payment contemplated by 11 U.S.C. § 101(5). (*Id.* ¶ 7.) The RSUs were not convertible at Brereton's option; they would vest automatically upon the passage of the vesting date so they are not subject to the exception in Bankruptcy Code section 101(16) that excludes a convertible right from the definition of an "equity security." Thus, the Plan Administrator argues, the RSUs were "equity securities," and Brereton is only asserting an equity interest, not a "claim" under section 101(5).

The Plan Administrator also attacks Brereton's depiction of the Second Bonus payment method—Brereton argues that the bonus was payable in RSUs or cash, but he fails to mention that a cash payment would have required special steps. (*Id.*) Delivery of the RSUs was the default option; the Debtors' compensation committee could only have directed a cash payment if the committee decided in its discretion that a cash payment was the better option. (*Id.*) The compensation committee never determined that Brereton should receive a cash payment instead of an RSU grant. (*Id.*)

Next, the Plan Administrator argues that to the extent Brereton asserts damages arising from the purchase of a security, his claim should be subordinated under Bankruptcy Code section 510(b). (*Id.* ¶ 11.) Bankruptcy Code section 101(49)(B) defines the term "security" by listing examples, but the list is non-exhaustive and the failure to mention RSUs as an example of a "security" is not dispositive. (*Id.* at 6.) The Plan Administrator asserts that the RSUs are similar to stock options. *Enron* demonstrates that a damages claim relating to employee stock options

should be subordinated. (*Id.* ¶ 11 (citing *Enron*, 341 B.R. at 151, 161).) The grantee of an RSU

is even more akin to a shareholder than the holder of a stock option, according to the Plan

Administrator. (*Id.*) To acquire shares, an option holder must exercise the option for cash; the

RSU grantee has a right to receive the shares based solely on a vesting schedule without any

payment. (*Id.*) Stock options that require the holder to take affirmative steps to acquire stock are

subordinated under section 510(b); RSUs that do not require any grantee action should be

subordinated as well. (*Id.*)

## I.    The Hearing

At the Hearing, Brereton's counsel conceded that Brereton has abandoned his claim to

unpaid salary, the $250,000 guaranteed incentive award, and unreimbursed expenses. The Court

then sustained the portion of the Forty-Seventh Objection relating to those claims, leaving only

his Second Bonus Claim.

## II.    DISCUSSION

Under the Bankruptcy Code, to assert a "claim" and be treated as a creditor, a claimant

must have a "right to payment" or a right to an "equitable remedy." 11 U.S.C. § 101(5)(A)(B).

A claimant asserting an equity interest is not a creditor and is not pursuing a "claim" under the

Code. *See In re Pine Lake Vill. Apt. Co.*, 21 B.R. 478, 480 (Bankr. S.D.N.Y. 1982) ("[A]n

equity interest is not a claim against the debtor for which the equity holder may assert a right to

payment.") To determine whether Brereton is asserting an equity interest, the Court turns to

Bankruptcy Code section 101(16), which defines an "equity security" as

> (A) share in a corporation, whether or not transferable or denominated "stock", or
> similar security;
>
> (B) interest of a limited partner in a limited partnership; or
>
> (C) warrant or right, other than a right to convert, to purchase, sell, or subscribe to
> a share, security, or interest of a kind specified in subparagraph (A) or (B) of this
> paragraph.

11 U.S.C. § 101(16).

Brereton argues that section 101(16) does not apply because the RSUs were convertible, and section 101(16)(C) excludes rights to convert from the definition of an "equity security." But the RSU Award Agreement does not grant Brereton the right to convert the units into MFGH common stock. Rather, the Brereton would be awarded shares without taking any action at all. (*See* RSU Award Agreement ¶¶ 4–6.) Vesting would have occured automatically, and the shares would have been delivered under one of the scenarios described in the RSU Award Agreement. (*See id.*)

Brereton also lacked the right to convert the RSUs into cash; only MFGH's compensation committee, in its discretion, could elect to award cash instead of stock. (*See id.* ¶ 4(b).) Because Brereton did not have a right to convert, he is asserting an interest based on an "equity security" and is therefore not asserting a claim at all.

Alternatively, even if the RSUs are not "equity securities," they still qualify as securities subject to subordination under Bankruptcy Code section 510(b). Bankruptcy Code section 510(b) provides in relevant part that claims seeking damages "arising from the purchase or sale" of a security issued by the debtor "shall be subordinated to all claims or interests that are senior to or equal to the claim or interest represented by such security." 11 U.S.C. § 510(b). The Code defines a security by providing a non-exhaustive list of examples, including stock, a bond, a debenture, the right to subscribe to or purchase or sell a security, or any "other claim or interest commonly known as 'security.'" 11 U.S.C. § 49(A). Given the broad and non-exclusive nature of the list, courts have interpreted this provision broadly. *See, e.g.*, *Enron*, 341 B.R. at 153–54 (stating that "the majority of courts in recent years that have confronted related issues concerning the scope of section 510(b) have concluded that the phrase 'arising from' should be read

10

broadly"); *In re Worldcom, Inc.*, 329 B.R. 10, 14 (Bankr. S.D.N.Y. 2005) ("So long as the nature

of the damage or harm complained of by a shareholder can be said to result as a consequence of

his having purchased or sold share of stock or other securities of the debtor, the claimant falls

within the scope of [s]ection 510(b)."). When holders of equity interests do not participate in a

distribution under a debtor's reorganization plan, subordination under section 510(b) effectively

precludes recovery. *See Enron*, 341 B.R. at 149.

In *Enron*, the court examined section 510(b)'s applicability to stock options and

concluded "that a stock option is a 'security' under the Bankruptcy Code." 341 B.R. at 150.

Limiting subordination strictly to "purchases" of securities would reflect "an unduly formalistic

reading of [section 510(b)]," creating a distinction between means of acquiring stock where the

distinction is "not legally relevant." *Id.* at 150. The *Enron* court also noted that "to the extent

that stock options necessarily implicate the purchase or sale of a security, it is doubtful that any

stock options can be [designed to avoid subordination]." *Id.* at 144 n.3.

At the Hearing, Brereton's counsel was unable to meaningfully distinguish RSUs from

stock options in a manner relevant to this inquiry. That is no surprise because RSUs, like stock

options, were a "means of acquiring stock" and therefore constitute securities under the Code

and relevant case law. *See id.* at 150. To the extent Brereton has a claim from the RSUs, that

claim must be subordinated under section 510(b).

Disallowing or subordinating the Second Bonus Claim has the same practical result—

Brereton cannot recover anything under the confirmed Plan. Therefore, the Court **SUSTAINS**

the Objections as they relate to Brereton's Second Bonus Claim.

### III.    CONCLUSION

Brereton agreed to a compensation package that would award him with MFGH stock upon the occurrence of certain events.  He could reap benefits if the stock performed well, or he could see the value of his compensation diminish if the stock dropped.  But the potential for him to reap benefits if the stock performed well sets him apart from a creditor.  Despite his contentions to the contrary, Brereton is asserting an equity interest based on the RSUs.  To the extent the Second Bonus Claim is a claim at all, it is a claim subject to subordination.  The Court therefore **SUSTAINS** the Objections as they relate to Brereton's Second Bonus Claim.

The Court already sustained a portion of the Forty-Seventh Objection relating to Claim 1363, disallowing and expunging the portion of the claim seeking unpaid salary, a $250,000 bonus, and unreimbursed expenses.  Only Brereton's $500,000 Second Bonus Claim in Claim 1363 remained.  That portion of Claim 1363 is now subordinated and reclassified as a Class 9A Common Interest.  Claim 1359 is also subordinated and reclassified as a Class 9A Common Interest.

**IT IS SO ORDERED.**

Dated:  August 6, 2014
        New York, New York

_____*Martin Glenn*_____
MARTIN GLENN
United States Bankruptcy Judge