**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FOR PUBLICATION

In re:

MF GLOBAL INC.,

Case No. 11-2790 (MG) SIPA

Debtor..

In re:

MF GLOBAL HOLDINGS LTD., *et al.,*

Case No. 11-15059 (MG)
(Jointly Administered)

Debtors.

**MEMORANDUM OPINION AND ORDER GRANTING MOTIONS TO APPROVE**
**SALE AND ASSUMPTION OF MF GLOBAL INC. ASSETS AND FOR OTHER RELIEF**

*A P P E A R A N C E S :*

HUGHES HUBBARD & REED LLP
*Attorneys for James W. Giddens,*
*Trustee for the SIPA Liquidation of*
*MF Global Inc.*
One Battery Park Plaza
New York, New York 10004
By:    James B. Kobak, Jr., Esq.
       Dustin P. Smith, Esq.
       Erin E. Diers, Esq.

JONES DAY
*Attorneys for MF Global Holdings Ltd.,*
*as Plan Administrator*
222 East 41st Street
New York, NY 10017
By:    Jane Rue Wittstein, Esq.

       and

JONES DAY
555 South Flower Street, Fiftieth Floor
Los Angeles, CA 90071
By:     Bruce Bennett, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court are the joint motions (together, the "Motions") filed by James

W. Giddens (the "Trustee"), Trustee for the SIPA Liquidation of MF Global Inc. ("MFGI") (the

"Trustee Motion," ECF Doc. # 8828),[1] and MF Global Holdings Ltd. ("MFGH" or the "Plan

Administrator") (the "MFGH Motion," ECF Doc. # 8829).[2]  The Trustee and MFGH seek entry

of an order approving:  (1)(a) the Trustee's sale of all of his claims, rights, and interests in all of

the MFGI estate's assets (the "Assigned Rights") to MFGH or its designated affiliate (MFGH or

such affiliate, the "Assignee") in exchange for the waiver by MFGH and certain of its affiliates

(collectively, the "MFGH Entities")[3] of future distributions on over $1.16 billion allowed general

unsecured creditor claims in an amount sufficient to allow the Trustee to make a final,

cumulative 94% or 95% distribution on all other non-subordinated allowed general unsecured

creditor claims against the MFGI estate not held by the MFGH Entities (such claims, the "Other

Unsecured Claims" held by the "Other Unsecured Creditors"), and (b) the Assignee's

assumption of certain of the Trustee's document retention and discovery obligations, as set forth

in the Sale and Assumption Agreement (the "Sale Agreement," Tr. Motion Ex. B); (2) the

transfer and abandonment of specified systems and documents and the corresponding limitation

of the Trustee's discovery and retention obligations; (3) the commencement of the final 94% or

---

[1] The Trustee Motion is supported by the declarations of Vilia B. Hayes (the "Hayes Decl.," Tr. Motion Ex. A) and Marlena C. Frantzides (the "Frantzides Decl.," *id.* Ex. B).

[2] The MFGH Motion is supported by the declarations of Erik M. Graber (the "Graber Decl.," MFGH Motion Ex. A) and Andrew Shannahan (the "Shannahan Decl.," *id.* Ex. B).

[3]  Specifically, the MFGH Entities are all of the Debtors (with the exception of MF Global Market Services LLC) plus the non-debtor affiliates, MF Global FX LLC and MF Global Special Investor LLC.  (Tr. Motion at 1 n.4.)

95% distribution to the Other Unsecured Creditors (the "Final Distribution") following consummation of the Sale Agreement; and (4) related relief. No objections to the Motions have been filed.

In many ways, these Motions mark a signal accomplishment in these very difficult cases. The Sale Agreement negotiated by these parties represents a creative and novel way to move these cases toward successful conclusions. Granting the Motions will likely allow MFGI's SIPA case to close within months rather than years. All of MFGI's allowed customer, secured, administrative and priority claims will be satisfied in full, and its general unsecured creditors' recoveries should be 94-95% of their allowed claims. That result could not have been predicted at the start of these cases. The MFGH creditors' ultimate recoveries will depend on outcome of the litigation and insurance claims, but MFGH has already received over $750 million from its claims against MFGI. By transferring most of its remaining assets to the Assignee, expenses of administration of the cases should be substantially reduced while MFGH's assets (mostly in the form of litigation claims in the pending MDL proceedings, and very substantial insurance claims) can be pursued and resolved by settlements or litigation. The rights of creditors, insurers and defendants in pending or possible litigation are preserved. MFGI will also abandon or transfer its systems and records (which may be needed in ongoing litigation) to MFGH, except for those systems and records that the Trustee will continue to maintain because of bankruptcy-specific retention requirements.

Because of the importance of the Motions to the progress of these cases, the Court will explain at some length the relief that has been requested and granted. As set forth below, the Motions are **GRANTED.**

# I.    **BACKGROUND**[4]

On October 31, 2011 (the "Filing Date"), the Honorable Paul A. Engelmayer, United States District Judge for the Southern District of New York, entered the Order Commencing Liquidation of MFGI (the "MFGI Liquidation Order") pursuant to the provisions of SIPA in the case captioned *Securities Investor Protection Corp. v. MF Global Inc.*, No. 11-CIV-7750 (PAE). (Tr.Motion ¶ 10.)  The MFGI Liquidation Order:  (i) appointed James W. Giddens as Trustee for the SIPA liquidation of MFGI; (ii) removed the liquidation proceeding to this Court for all purposes as required for SIPA proceedings under 15 U.S.C. § 78eee(b)(4) (the "SIPA Proceeding," Case No. 11-02790); and (iii) imposed the automatic stay provisions of 11 U.S.C. § 362(a) (the "Automatic Stay").  (*Id.*)

Also on October 31, 2011, MFGH and most of its unregulated subsidiaries and affiliates filed cases in this Court under chapter 11 of the Bankruptcy Code.  This Court has presided over the SIPA and MFGH cases.  The MFGH Entities hold allowed unsecured claims totaling $1,162,906,044.99 against the MFGI estate (the "MFGH Unsecured Claims").  (*Id.* ¶ 11.)  The MFGH Unsecured Claims represent more than 85% of the $1.36 billion of allowed, non-subordinated general unsecured claims against the MFGI estate.  (*Id.*)  The MFGH Entities have received approximately $751 million in *pro rata* distributions on the MFGH Unsecured Claims. (*Id.*)  The SIPA Trustee has distributed $991.6 million (or 74%) to holders of 784 allowed unsecured general creditor claims, including the MFGH Unsecured Claims, and has also completed 100% distributions on all allowed secured, administrative, priority, and customer claims.  (*Id.* ¶ 12.)

---

[4]    The facts recited in this Opinion are described in the Trustee Motion and supporting declarations.

A.      **Remaining Potential Sources of Recovery**

1.      *The Multidistrict Litigation Claims and the E&O Claim*

Chief among the remaining potential sources of recovery—and the chief remaining potential cause of expense to the MFGI estate—are claims arising from the shortfall in customer property available to satisfy allowed commodity claims asserted against former officers, directors, and/or other employees of MF Global and other third parties (collectively, the "MDL Defendants") in the Multidistrict Litigation (the "MDL").  (*See id.* ¶¶ 2, 13.)  On November 5, 2012, the Customer Representatives[5] filed a Consolidated Amended Class Action Complaint against the MDL Defendants alleging, among other things, violations of the Commodity Exchange Act, breach of fiduciary duty, and negligence.  (*Id.* ¶ 13.)  The Customer Representatives subsequently assigned their claims to the Trustee—as a representative of MFGI's general creditors—in consideration of the advance of general estate funds sufficient to satisfy all allowed customer net equity claims in the SIPA Proceeding.  (*Id.*)  The MDL Defendants' defense costs are being paid by the MF Global director and officer ("D&O") and errors and omissions ("E&O") insurers.  (*See id.*)

The Trustee has also asserted a separate, direct claim with respect to the E&O policies.  (*Id.* ¶ 14.)  On March 28, 2012, the Trustee provided the E&O insurers notice of circumstances that may give rise to a loss under the E&O policies (the "E&O Claim"), which the E&O insurers acknowledged on March 30, 2012.  (*Id.*)  However, the E&O insurers have not issued a coverage determination on the E&O Claim.  (*Id.*)  The Trustee has made repeated attempts to resolve the E&O Claim but expects that it can only be resolved through a global settlement in the MDL or

---

[5]   The "Customer Representatives" are customers of and former commodities account holders at MFGI who have asserted claims in the MDL arising from the shortfall in customer property in the MFGI customer estates.  (Tr. Motion at 8 n.7.)

other litigation.  (*Id.*)  MFGH and its affiliates have been actively engaged in settlement

discussions related to the E&O policies.  (*Id.*)

Discovery between the Customer Representatives and the MDL Defendants is scheduled

to be completed by November 23, 2015.  (*Id.* ¶ 15.)  The MDL Defendants' extensive discovery

requests, along with the concomitant need for the Trustee to maintain systems used by MFGI

before the Filing Date, has been a significant source of expense for the MFGI estate.  (*Id.*)  And

mediation between the MDL parties has so far failed to result in a settlement.  (*Id.*)

### 2.    *The Fidelity Bond Claim and Other Insurance Rights*

On December 5, 2011, MF Global's broker—on behalf of MFGH and MFGI—provided

notice under the fidelity bond insurance policies (together, the "Fidelity Bond") of circumstances

that may give rise to a loss.  (*See id.* ¶ 16.)  On July 25, 2012, MFGI timely filed a proof of loss

with respect to the Fidelity Bond, which was supplemented by a revised proof of loss on May 18,

2015 (the "Fidelity Bond Claim").  (*Id.*)  However, the Fidelity Bond insurers have not issued a

coverage determination on the Fidelity Bond Claim.  (*Id.*)  And, according to the Trustee,

litigation may be necessary to resolve the claims asserted against the Fidelity Bond.  (*Id.*)

The Sale Agreement provides for the transfer of the Fidelity Bond Claim as well as the

transfer of the MFGI estate's rights under certain other pre-Filing Date insurance policies,

including the D&O policies and the fiduciary policies.  (*Id.* ¶¶ 16–17.)

### 3.    *MF Global UK Recoveries*

Under the court-approved settlement agreement between the Trustee and the

administrators for MF Global UK ("MFGUK"), the MFGI estate was allowed a net unsecured

creditor claim of $323,138,456 in the MFGUK insolvency proceeding (after certain agreed set-

offs) (the "MFGUK Claim").  (*Id.* ¶ 18.)  The MFGI estate has received a 84.5% distribution on

the MFGUK Claim.  (*Id.*)  As of March 31, 2015, the MFGUK Administrators projected that

unsecured creditor claims will receive cumulative distributions of 95.3% to 100%, which would

result in additional future distributions to the MFGI estate on account of the MFGUK Claim in

the range of $34.9–48.5 million.  (*Id.*)

#### 4.    *Dooley Contingent Consideration*

By agreement dated May 23, 2014 (the "Dooley Assignment"), the Trustee assigned to

the Plan Administrator the MFGI estate's right and interest in the claim and litigation related to

an asserted proof of loss concerning approximately $141 million in losses sustained by MFGI as

a result of illegal trading activity by Evan Dooley between February 26 and 27, 2008 (the

"Dooley Claims").  (*Id.* ¶ 19.)  Under the Dooley Assignment, the Trustee retained a contingent

right to certain recovered amounts if the settlement of the claim and/or proceeds of litigation

exceeded $135 million (the "Dooley Contingent Consideration").  (*Id.*)  Litigation of the Dooley

Claims is still pending, and any net recovery is contingent and uncertain.  (*Id.*)

#### 5.    *LCH Consideration*

By agreement dated December 22, 2012, the Trustee and MFGUK's Joint Special

Administrators addressed the treatment of potential recoveries from LCH.Clearnet Limited and

LCH.Clearnet S.A. (together, "LCH").  (*Id.* ¶ 20.)  No such recoveries have occurred; however

the Trustee, the Plan Administrator, and the Joint Special Administrators of MFGUK have

determined that, under certain circumstances, MFGI could share in proceeds recovered from

LCH if litigation were brought and succeeded (the "LCH Contingent Consideration").  (*Id.*)

#### 6.    *Remaining Cash and Other Potential Assets of the MFGI Estate*

As of July 15, 2015, the Trustee maintains cash in accounts of approximately $153.4

million.  (*Id.* ¶ 21.)  Of this amount, $56 million will be held in reserves for:  (i) the six

remaining disputed non-subordinated, unsecured claims (the "Disputed Claims");[6] (ii) the

allowable amount of any asserted administrative claims; (iii) payment of accrued but unpaid

administrative expenses of the Trustee and his professionals; (iv) payment of future

administrative costs that may be incurred by the Trustee and his professionals in connection with

the resolution of the Disputed Claims; and (v) costs that may be incurred by the Trustee and his

professionals associated with the MDL and other pending litigation.  (*Id.*)  The available cash

remaining after the Final Distribution and these reserves will be transferred to the Assignee

under the Sale Agreement.  (*Id.*)

MFGI's estate holds certain other known and unknown remaining assets and potential

sources of recovery that will be assigned to the Assignee under the Sale Agreement (the

"Remnant Assigned Assets").  (*Id.* ¶ 22.)  The total value of the Remnant Assigned Assets at the

time of the Closing[7] is not expected to exceed $5 million.  (*Id.*)

### B.    Assigned Contracts and Assumed Obligations

In the course of its operations, MFGI maintained voluminous systems and had

relationships with hundreds of vendors.  (*See id.* ¶ 23.)  Over the course of the SIPA Proceeding,

the Trustee's professionals have worked to reduce administrative costs and eliminate

unnecessary information technology.  (*See id.*)  First, on October 25, 2013, the Trustee filed a

motion to abandon two electronic data archives—the Autonomy email archive and the Refco-

related data hosted by Transactis—which the Court approved on November 21, 2013.  (*Id.*; *see*

ECF Doc. # 7259.)  Second, on January 10, 2014, the Trustee filed a second motion to

---

[6]  The Trustee Motion identifies seven Disputed Claims but one Disputed Claim (Claim No. 500000200 of Charles Sonson) has since been resolved by stipulation and order.  (*See* ECF Doc. # 8844.)

[7]  The "Closing" shall take place at 10:00 a.m. on the second Business Day following the date on which the order approving the Motion becomes a final, non-appealable order of the Court that has not been stated by another order. (*See* Sale Agreement § 5.1.)

decommission three additional computer systems. (Tr. Motion ¶ 23.) Certain of the MDL

Defendants objected to this motion, and the Trustee filed a reply. (*Id.* ¶ 23 n.12.) The Court

entered an order denying the Trustee's motion without prejudice and, thereafter, the parties

entered into a stipulation resolving the motion, which the Court entered on June 19, 2014. (*Id.*;

*see* ECF Doc. # 8014.) Finally, on November 13, 2014, the Trustee filed a third motion to

abandon more than 39,500 boxes of paper records predating August 1, 2006, which the Court

approved on December 16, 2014. (Tr. Motion ¶ 23; *see* ECF Doc. # 8546.)

Three categories of systems and record depositories remain in the MFGI estate:

(i) systems and record depositories that are subject to a preservation obligation in connection

with the MDL or other pending litigation, which will be assigned to and assumed by the

Assignee under the Sale Agreement (collectively, the "Assigned Records," Sale Agreement Exs.

B–C); (ii) systems and records that are subject to bankruptcy-specific retention requirements

imposed on the SIPA Trustee that are not necessary for the MDL that will be retained by the

SIPA Trustee (collectively, the "Retained Records"); and (iii) certain systems and records that

are not subject to any retention obligation, which the SIPA Trustee seeks authorization to

abandon through the Motions (collectively, the "Abandoned Records"). (*See* Tr. Motion ¶ 24.)

### 1.    The Assigned Records

The Assigned Records are subject to a preservation obligation in connection with the

MDL or other pending litigations and will be assigned to the Assignee under the Sale

Agreement. (*Id.* ¶ 25.) The Assigned Records include hard copy document storage, tape and

media storage, support and warranty, email archives, and systems that provided information to

the futures commission merchant and broker-dealer. (*Id.* (citing Frantzides Decl. ¶¶ 5–29).) The

Assignee will be assuming the Trustee's discovery and related preservation obligations with

9

respect to the MDL Litigation and any litigations relating to the Assigned Rights.  (*Id.*)  The

Trustee will no longer maintain the possession, custody, or control of the systems necessary to

respond to future requests related to the Assigned Records, further reducing expenses of the

MFGI estate.  (*See id.* ¶ 26.)  The Trustee has provided notice of the Motions to all regulators

and third parties who have submitted a subpoena or document request to the Trustee for

documents since the Filing Date.  (*Id.*)

2.    *The Retained Records*

The Trustee will continue to maintain certain systems and records that are subject to

bankruptcy-specific retention requirements, and that will not be assumed by the Assignee under

the Sale Agreement.  (*Id.* ¶ 27.)  According to the Trustee, in a SIPA proceeding, records of the

liquidation must be retained for five years from the close of the proceedings, which includes

post-Filing Date claim forms submitted in the SIPA proceeding and related claim reconciliations.

(*Id.*)  The Trustee is required under rules promulgated by the Commodity Futures Trading

Commission to maintain records reflecting the Trustee's daily computations of the funded

balances of each account with open commodities contracts, which must be retained for the longer

of one year after the close of bankruptcy proceedings or five years from creation of the record.

(*Id.* (citing 17 C.F.R. § 190.04(b)–(c)).)  These are the only retention obligation of the Trustee

that will survive the Closing.  (*Id.*)

3.    *The Abandoned Records*

Schedule A to the proposed order granting the Motions (the "Proposed Order," ECF Doc.

# 8827 Ex. A) sets forth what constitute the Abandoned Records—MFGI's prepetition licenses,

systems, and records not subject to document retention obligations in the MDL or under any

applicable statue or regulation.  (Tr. Motion ¶ 28.)  Specifically, the Abandoned Records consist

10

of:  (i) the UNICOM license, a vendor licensing for user menu management software for the

GMI system (a system containing data related to commodities trading); (ii) Relativity, a data

collection, production, and review platform maintained by the Trustee's professionals that

includes only data that is duplicative of information in other systems to be retained or assigned to

the Plan Administrator; and (iii) CMTA, an executive invoicing system relating to the equity and

equity options side of the MFGI business, and its related applications, which are no longer

necessary as MFGI is no longer executing trades or issuing invoices.  (*Id.*; *see* Proposed Order,

sch. A.)  The Trustee seeks to abandon the Abandoned Records.  (Tr. Motion ¶ 28.)

### C.    General Creditor Claim Distributions and Disputed Claims

The Trustee has made distributions of over $1 billion from the general estate pursuant to

two orders entered by the Court (together, the "Prior Distribution Orders").  (*Id.* ¶ 29.)  On

October 1, 2014, the Court entered an order (the "First Distribution Order," ECF Doc. # 8364)

that capped the maximum allowable amounts of claims, established a $42 million priority claims

reserve (the "Priority Claims Reserve") and an unsecured claims reserve (the "Unsecured Claims

Reserve"), and authorized a 100% distribution on all allowed priority claims and a 39%

distribution on all allowed unsecured general creditor claims that began on October 31, 2014.

(Tr. Motion ¶ 29.)  On April 16, 2015, the Court entered an order (the "Second Distribution

Order," ECF Doc. # 8745) that authorized the release of unnecessary reserves from the Priority

Claims Reserve and the Unsecured Claims Reserve, established a second unsecured claims

reserve (the "Second Unsecured Claims Reserve" and, together with the Priority Claims Reserve

and the Unsecured Claims Reserve, the "Claims Reserves"), and authorized a second interim

distribution of 35% (resulting in cumulative distributions of 74%) on all allowed unsecured

general creditor claims that began on April 30, 2015.  (Tr. Motion ¶ 29.)

11

###### 1.    The Claims Reserves

The following distributions have been made as of July 15, 2015:  (1) $34 million has

been distributed to claimants from the Priority Claims Reserve; (2) $524 million has been

distributed to claimants from the Unsecured Claims Reserve; and (3) $470 million has been

distributed to claimants from the Second Unsecured Claims Reserve.  (*Id.* ¶ 30.)

Between April 8, 2015 and July 23, 2015, the Trustee has resolved two priority claims

and four unsecured claims for amounts less than their capped amounts and, therefore, the amount

reserved for such claims no longer needs to be maintained.  (*Id.* ¶ 31.)  Consistent with reserve

amounts attributed to claims that were allowed or settled for less than their capped amounts,

voluntarily withdrawn, expunged by Court order, or subordinated or reclassified to equity, the

Trustee asserts that:  (1) $355,928.85 in reserves can be released from the Priority Claims

Reserve; (2) $2,089,199.14 in reserves can be released from the Unsecured Claims Reserve; and

(3) $1,874,922.31 in reserves can be released from the Second Unsecured Claims Reserve.  (*Id.*)

The remaining $1.7 million of the Priority Claims Reserve relates to reserves of:

(i) approximately $0.4 million subject to release (pursuant to the Motions) as no longer

necessary; (ii) $0.2 million equal to 100% of the capped amounts of all unresolved priority

claims and amounts reserved for taxes the estate is liable for based on distributions; and

(iii) $1.1 million for the 100% distribution on allowed claims of claimants who have not

provided the Trustee with necessary distribution information or whose distributions are currently

in process.  (*Id.* ¶ 32.)

The remaining $21.3 million of the Unsecured Claims Reserve relates to reserves of:

(i) approximately $2.1 million subject to release (pursuant to the Motions) as no longer

necessary; (ii) $13.9 million equal to 39% of the capped amounts of all unresolved unsecured

claims; and (iii) $5.3 million for the 39% distribution on allowed claims of claimants who have

not provided the Trustee with necessary distribution information or whose distributions are

currently in process.  (*Id.* ¶ 33.)

The remaining $19.2 million of the Second Unsecured Claims Reserve relates to reserves

of:  (i) approximately $1.9 million subject to release (pursuant to the Motions) as no longer

necessary; (ii) $12.5 million equal to 35% of the capped amounts of all unresolved unsecured

claims; and (iii) $4.8 million for the 35% distribution on allowed claims of claimants who have

not provided the Trustee with necessary distribution information or whose distributions are

currently in process.  (*Id.* ¶ 34.)

### 2.    *Administrative Expense Claims*

On July 22, 2015, the Trustee filed a motion to establish a bar date of September 4, 2015

(the "Supplemental Administrative Expense Bar Date") for claims for the payment of

administrative expenses arising between September 1, 2013 and July 31, 2015.  (*Id.* ¶ 35.)  The

Trustee will establish a reserve of 100% of the allowable amount of all claims for administrative

expenses received before the Supplemental Administrative Expense Bar Date.  (*Id.*)

### 3.    *The Other Unsecured Claims and the Disputed Claims*

Two categories of general unsecured claims remain subject to the Trustee's proposed

Final Distribution:  (i) the Other Unsecured Claims (Proposed Order, sch. B);[8] and (ii) the

Disputed Claims (*id.* sch. C).  (Tr. Motion ¶ 36.)  Of the 7,715 general creditor claims asserted or

reclassified from customer status, only the following six Disputed Claims remain unresolved:

---

[8]  According to the Trustee, he subordinated claims of MF Global Finance USA Inc. and MF Global Holdings USA
Inc., in the amounts of $470 million and $130 million, respectively, and all other subordinated general unsecured
claims in the SIPA Proceeding, do not constitute Other Unsecured Claims, do not receive any distributions under the
Sale Agreement, and will be discharged without any recovery.  (Tr. Motion ¶ 38.)

### a.   Robert Charles Class A ("RCA") (Claim No. 500000143)

RCA asserted a $23.4 million claim against the MFGI estate, alleging that the specifically authorized transfer of its account from Morgan Stanley Smith Barney to MFGI constituted unauthorized trading by MFGI in RCA's account.  (*Id.* ¶ 37(a).)  The Court issued an opinion (ECF Doc. # 8775) granting the Trustee's objection and disallowing certain portions of the claim, but held that RCA had pleaded at the sufficiency hearing stage a claim against MFGI for failure to follow customer instructions.  (Tr. Motion ¶ 37(a).)  Discovery is to be completed by October 30, 2015 and a merits hearing is tentatively scheduled for early December.  (*Id.*)

### b.   American Bullion Exchange (Claim No. 4646) and Ryan A. Nassbridge, as Trustee of ABCC Trust (Claim No. 900020605) (collectively, "ABEX")

ABEX filed two claims in the total amount of $8.7 million alleging fraud and misrepresentation in connection with its accounts at MFGI.  (*Id.* ¶ 37(b).)  On August 27, 2014, the Court entered an order (ECF No. 8239) disallowing and expunging the claims of ABEX on the grounds that the claims had been filed after the contractual limitations period.  (Tr. Motion ¶ 37(b).)  ABEX filed an appeal of this decision to the United States District Court for the Southern District of New York.  On August 13, 2015, the District Court issued an Opinion and Order affirming the decision of this Court.  (Case No. 1:14-cv-08155-LGS, ECF Doc. # 18.)  ABEX's time to appeal the decision of the District Court has not yet run.

### c.   CVF Lux Master S.a.R.L. ("CVF") (Claim No. 2443)

CVF asserted a claim against the MFGI estate alleging that MFGI was vicariously liable for violations of German law by introducing brokers.  (*Id.* ¶ 37(c).)  On October 15, 2014, the Court entered an order (ECF Doc. # 8421) reducing the amount of the claim to $2,720,403.54.  (Tr. Motion ¶ 37(c).)  The Trustee and CVF are discussing a potential resolution to this claim.  (*Id.*)

14

### d.    Sentinel Liquidation Trust ("Sentinel") (Claim No. 300000309)

Sentinel filed a claim in the amount of $50,122,480.00 against MFGI based on alleged preferential transfers made shortly before Sentinel's collapse.  (*Id.* ¶ 37(e).)  Pursuant to a stipulation, the Trustee and Sentinel have jointly agreed to a Capped Amount of $400,000.00, which is a reduction to the Capped Amount set forth in the First Distribution Order.  (*Id.*)

### e.    Goldman Sachs & Co. ("Goldman") (Claim No. 5441)

Goldman filed an unliquidated prophylactic claim based on the close-out of certain transactions following the commencement of the MFGI liquidation.  (*Id.* ¶ 37(f).)  As Goldman noted in its proof of claim, the close-out of these positions resulted in a net payable to MFGI, but it filed the claim in the event that the netting and setoff was determined to be impermissible under relevant law.  (*Id.*)  The Trustee and Goldman are negotiating the amount of the payment owed to MFGI as a result of these transactions, and once resolved, this claim will be withdrawn. (*Id.*)  This claim was capped at $0.00 in the First Distribution Order.  (*Id.*)

### D.    The Sale Agreement

The principal terms of the Sale Agreement are as follows:

a)    Upon approval of the Sale Agreement by the Court, on the Closing Date, the SPA Trustee will assign to the Assignee all of the Trustee's rights, remedies, titles, and interests in the MDL Assigned Claims, the E&O Assigned Claims, the D&O Assigned Claims, the Fidelity Bond Assigned Claims, the Fiduciary Policy Assigned Claims, the MFGUK Assigned Claim, the Dooley Assigned Claims, the LCH Assigned Claim, the Assigned Cash (which includes all cash under the Trustee's control except for required reserves and the amount necessary to complete the Final Distribution), the Remnant Assigned Assets, the Assigned

15

Records (including, but not limited to, the Trustee's rights and interests in all non-privileged documents, data, and systems services contracts), and other Assigned Rights, as defined in the Sale Agreement, free and clear of all liens, claims, encumbrances, and interests;

b)   In exchange, the MFGH Entities will waive remaining distributions on their over $1.16 billion of general unsecured claims sufficient to allow the Trustee to make the Final Distribution to the Other Unsecured Creditors; and

c)   The Assignee will assume the liabilities and obligations of the Trustee and the MFGI estate under the agreements with the Customer Representatives and the Assigned Records, including the obligation to respond to discovery requests and preserve documents, data, and systems with respect to the MDL Assignment Claims, the E&O Assigned Claims, the D&O Assigned Claims, the Fidelity Bond Assigned Claims, the MFGUK Assigned Claim, the Dooley Assigned Claims, the LCH Assigned Claims, and any other litigation or proceedings relating to the Assigned Rights.

(*Id.* ¶ 39.)

## II.   DISCUSSION

### A.   Approval of the Sale Agreement

Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ."  11 U.S.C. § 363(b)(1).  In approving a transaction conducted pursuant to section 363(b)(1), courts consider whether the trustee exercised sound business judgment.  *See In re Chateaugay Corp.*, 973 F.2d 141, 144–45 (2d Cir. 1992) (affirming bankruptcy court's approval

of asset sale under section 363(b) because good business reason supported the sale); *see also*

*Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1072 (2d Cir.

1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly

find from the evidence presented before him at the hearing a good business reason to grant such

an application."); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003)

(holding that the standard for approval of a motion under section 363 is whether there is a "good

business reason" to support the motion).

The business judgment of a trustee is entitled to great deference.  *See In re Borders Grp.,

Inc.*, 453 B.R. 477, 483 (Bankr. S.D.N.Y. 2011).  A trustee generally satisfies the business

judgment standard if he "acted on an informed basis, in good faith and in the honest belief that

the action taken was in the best interests of the company."  *In re Integrated Res., Inc.*, 147 B.R.

650, 656 (Bankr. S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del.

1985)).  "Courts should not generally interfere with business decisions absent a showing of 'bad

faith, self-interest, or gross negligence.'"  *Borders*, 453 B.R. at 482 (quoting *Integrated Res.*, 147

B.R. at 656).

The Trustee asserts that he has established that approval of the Sale Agreement is

warranted under section 363(b) of the Bankruptcy Code.  (*See* Tr. Motion ¶¶ 40–57.)  According

to the Trustee, he has determined in his sound business judgment that the transaction

contemplated by the Sale Agreement "represents the best means of immediately monetizing and

maximizing the value of the remaining assets and potential recoveries of the MFGI estate for the

benefit of the MFGI's creditors without the delay, expense, risk, and uncertainty of further

litigation."  (*Id.* ¶ 43.)  Moreover, the Trustee asserts that a private sale to the Assignee is

appropriate because "[MFGH] [is] the only purchaser who has expressed a willingness to

purchase the Assigned Rights and assume the Assumed Liabilities and Obligations, [and] . . . is also in the uniquely favorable position of having familiarity with the Assigned Rights, and having participated in the litigation and settlement negotiations to date." (*Id.* ¶ 46.) Furthermore, the Trustee claims that:  (i) he has provided interested parties with adequate and reasonable notice (*id.* ¶ 47); (ii) the consideration provided by the parties is fair and reasonable (*id.* ¶¶ 48–49); (iii) both parties are proceeding in good faith (*id.* ¶ 50); (iv) the insurance claims are fully assignable to the Assignee, notwithstanding anti-assignment clauses contained in certain of the policies because the assignments are made after a loss has occurred and became a cause of action (*id.* ¶ 51–52); (v) assignment of the Assigned Rights free and clear of liens, claims, and encumbrances is appropriate (*id.* ¶ 53); (vi) the assignment to the Assignee should be final, and the Assignee should obtain the protections of section 363(m) of the Bankruptcy Code (*id.* ¶¶ 54–55); and (vii) waiver of the fourteen-day stay imposed by Rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") is appropriate (*id.* ¶ 56).

The Plan Administrator asserts that the Court has broad authority under the Bankruptcy Code to approve and authorize the Plan Administrator to enter into the Sale Agreement.  (MFGH Motion ¶ 12 (citing 11 U.S.C. § 1142(a)–(b)).)  According to the Plan Administrator, the relief requested in the Motions is consistent with, and will facilitate the implementation of, the Debtors' chapter 11 plan of liquidation (the "Plan," ECF Doc. # 1382).  (MFGH Motion ¶ 13.) Specifically, the Plan provides the Plan Administrator broad authority to take any action "deemed by the Plan Administrator to be necessary and proper to implement the provisions of the Plan."  (*Id.* (quoting Plan § IV.C).)  The Plan Administrator asserts that it has evaluated the proposed transaction and concluded, based on its reasonable business judgment, that entering

into the Sale Agreement is likely to maximize the value of the Debtors' estates for the benefit of the MFGH Entities.  (*Id.* ¶ 14.)

### B.      Abandonment of Records

Section 554(a) of the Bankruptcy Code provides that "[a]fter a notice and hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate."  11 U.S.C. § 554(a).  Abandonment may not be authorized without "the requisite showing that the asset in question was of inconsequential value and benefit to the estate, and without ascertaining that the trustee's determination to that effect 'reflect[ed] a business judgment made in good faith, upon a reasonable basis and within the scope of his authority under the Code.'"  *In re Sullivan & Lodge, Inc.*, No. C03-00588 (CRB), 2003 WL 22037724, at *4 (N.D. Cal. Aug. 20, 2003) (quoting *In re Wilson*, 94 B.R. 886, 888 (Bankr. E.D. Va. 1989)).  The notice and hearing requirement ensures that interested parties have an opportunity to object to a proposed abandonment.  5 COLLIER ON BANKRUPTCY ¶ 554.01 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2014).  Bankruptcy Rule 6007(a) provides that "[u]nless otherwise directed by the court, the trustee or debtor in possession shall give notice of a proposed abandonment or disposition of property to the United States Trustee, all creditors, indenture trustees, and committees elected pursuant to § 705 or appointed pursuant to §1102."  FED. R. BANKR. P. 6007(a).  Bankruptcy Rule 6007(a) also provides that a party in interest may object within 14 days of the mailing of the notice.  *See id.*

The Trustee asserts that he determined in his sound business judgment that abandonment of the Abandoned Records is appropriate because they are no longer necessary (*id.* ¶¶ 60–61), and abandonment of such records "will allow him to expeditiously close the estate following

consummation of the Sale . . . Agreement (if approved), completion of the Final Distribution, and

resolution of the Disputed Claims" (*id.* ¶ 62).

### C. Approval of the Final Distribution

Sections 502, 507, and 726 of the Bankruptcy Code are made applicable to a SIPA

liquidation pursuant to section 78fff(b) of SIPA.  *See* 15 U.S.C. 78fff(b) ("[A] liquidation

proceeding shall be conducted in accordance with, and as though it were being conducted under

chapter 1, 3, and 5 and subchapters I and II of chapter 7 of Title 11.").  Distribution priorities in a

SIPA liquidation proceeding shall be as provided under section 726 of the Bankruptcy Code.  *See*

15 U.S.C. § 78fff(e).  Under Bankruptcy Code section 726(a), property shall be distributed first

in respect of "claims of the kind specified in, and in the order specified in, section 507," and then

on allowed unsecured claims.  11 U.S.C. § 726(a).  Bankruptcy Rule 3009 provides that "[i]n a

chapter 7 case, dividends paid to creditors shall be paid as promptly as practicable."  FED. R.

BANKR. P. 3009.

If the Sale Agreement is approved, the Trustee requests that the Court authorize the

Trustee (upon consummation of the Sale Agreement) to:

a)      Establish a final unsecured claims reserve in the amount of approximately $48.7

million (if the Final Distribution Percentage is 95%) or $46.4 million (if the Final

Distribution Percentage is 94%) for all Other Unsecured Claims; which shall

include approximately:  (i) $41.3 million (if the Final Distribution Percentage is

95%) or $39.3 million (if the Final Distribution Percentage is 94%) eligible for

distribution to the Other Unsecured Creditors; and (ii) $7.5 million (if the Final

Distribution Percentage is 95%) or $7.1 million (if the Final Distribution

Percentage is 94%) to establish reserves for the Disputed Claims on a pro rata

basis to protect the interests and due process rights of the holders of those claims

(the "Final Unsecured Claims Reserve");

b)      Establish a reserve in the amount of 100% of the allowable amount of all claims

with respect to administrative expenses arising between September 1, 2013 and

July 31, 2015 received by the Trustee on or before the Supplemental

Administrative Expense Bar Date, if approved by the Court (the "Administrative

Expense Claims Reserve");

c)      Release to the Plan Administrator reserves that are no longer necessary from the

Priority Claims Reserve, the Unsecured Claims Reserve, and the Second

Unsecured Claims Reserve in the amounts of $0.35 million, $2.09 million, and

$1.88 million, respectively;

d)      Make a third and final distribution to holders of the Other Unsecured Claims as of

the Record Date of August 7, 2015, or to holders of Disputed Claims as of the

same Record Date, if and when such claims become allowed claims; and

e)      Require claimants to cash all final distribution checks within the ninety-day

expiration period.

(*Id.* ¶ 63.)  According to the Trustee, approving these means for implementing the Final

Distribution will allow a prompt distribution to be made to Other Unsecured Creditors (*see id.*

¶ 64), is consistent with the Court's Prior Distribution Orders (*id.* ¶¶ 68–69), and is permitted

under section 726 of the Bankruptcy Code (*id.* ¶¶ 70–73).

### III.    <u>CONCLUSION</u>

The Trustee and MFGH have established by uncontroverted evidence that entering into

the Sale Agreement reflects the appropriate exercise of their sound business judgment.  The

parties were represented by experienced counsel who negotiated the terms of the Sale Agreement over the course of several months.  (*See* Hayes Decl. ¶¶ 26–27.)  Despite providing broad notice of the Motions to interested parties, no party has objected to the Motions or raised any concern that the Sale Agreement was not the product of good faith, arm's length negotiations.  Nor has any party objected to the adequacy of the consideration provided under the Sale Agreement.  The terms of the sale are fair, reasonable and in the best interests of the creditors of all of the debtors' estates.

With respect to the Abandoned Records, the Trustee has provided notice of his intention to abandon the systems and records and established a sound business reason to support his decision—to jettison unnecessary systems and records in order to expeditiously close the SIPA Proceeding.  The Motions properly provide for transfer and preservation of the records necessary for any pending or potential litigation.

Likewise, the scheme for implementing the Final Distribution is reasonable and appropriate for the Trustee to close the SIPA Proceeding.

For all of the foregoing reasons, the Motions are **GRANTED**.  A separate Order will be entered.

Dated:  August 19, 2015
         New York, New York


_____*Martin Glenn*_____
MARTIN GLENN
United States Bankruptcy Judge